345 P.2d 928]

[Crim. No. 6522. In Bank. Nov. 6, 1959.]

THE PEOPLE, Respondent, v. ROBERT BENFORD, Appellant.

Ellis J. Horvitz, under appointment by the Supreme Court, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and John A. Vanderlans, Deputy Attorney General, for Respondent.

SCHAUER, J. — An indictment filed April 15, 1958, charged that on December 11, 1957, defendant "did . . . feloniously sell, furnish and give away . . . marijuana" in violation of section 11500 of the Health and Safety Code and that in 1951 he had suffered a conviction under the same sec-

tion. After trial the court found defendant guilty as charged and found that the allegation of the 1951 prior conviction was true. Defendant appeals from the ensuing judgment. He urges that as a matter of law uncontradicted testimony of a police officer establishes the defense of entrapment. Also he asks this court to take additional testimony which he says will establish the defense or at least require a new trial. We have concluded that the application to produce evidence should be denied and the judgment of conviction affirmed.

Defendant personally and counsel for both parties waived trial by jury. By stipulation the court considered the transcript of the proceedings before the grand jury, and each side produced additional evidence.

Officer Cornelius Pryor testified before the grand jury that on December 10, 1957, he "asked [defendant] if we could get together the next day to go out and purchase some marijuana," and that on the 11th defendant and the officer drove to a housing project, the officer handed defendant $15, defendant left the car, returned in about half an hour, and handed the officer a dollar and a bag which (according to testimony of a chemist) contained 43 grams of marijuana. On cross-examination at the trial Officer Pryor further testified that he met defendant and his wife through one of their neighbors about a month before December 11; that he had visited defendant's apartment and occasionally had beer with him at a tavern; and that $14 was about the usual price, "maybe a little more," for 43 grams of marijuana.

The officer further testified as follows concerning his conversations with defendant as to marijuana:

"Q. Was the subject of marijuana first mentioned by you on the 11th or some time prior to that date? A. No. I mentioned it to him on the 10th, I would say.

"Q. Had you mentioned it to him on a date prior to that? A. That's pretty difficult to answer, but—I don't know, maybe I did.

"Q. It would be a fair statement, would it, then, to say that perhaps on two or three occasions prior to the 11th the subject of marijuana was discussed between you and the defendant? A. Yes, I would say so."

The prosecution placed in evidence a recorded interview of defendant by Sergeant Salagi and Officer Pryor on April 22, 1958. (It should be remembered that the date of the claimed sale was December 11, 1957.) At the beginning of this interview defendant said that he had not previously known that

Pryor was a police officer. Asked to "tell us about this incident that transpired between you," defendant said, "I see nothing to tell." Officer Pryor described the incident of December 11 and defendant first said that he did not remember it, then that he did not get any marijuana, then that he got it at the housing project named by the officer. Defendant refused to identify with particularity the person or place from which he obtained the narcotic. He said that "whoever I got it from, they didn't give me nothing, . . . it was just a favor that I'd be doing." Defendant was asked by Officer Pryor, "This day you sold to the officer, you didn't get anything out of that?" Defendant replied, "What did you give me, a dollar and a half, or something. . . . I didn't figure I had anything coming. I didn't ask for anything."

Salient uncontradicted portions of the defense testimony[1] tend to show that a manifestly reluctant defendant was induced to obtain marijuana for the officer by the latter's repeated requests, gestures of friendship, and appeals to sympathy. In arguing that the defense of entrapment is established as a matter of law, defendant properly refrains from reliance on such testimony, for the trier of fact was not required to give it credence and it is not our function to reappraise its effect. (*People* v. *Merkouris* (1959), 52 Cal.2d 672, 678 [1] [344 P.2d 1]; *People* v. *De Paula* (1954), 43 Cal.2d 643, 649 [9] [276 P.2d 600]; *People* v. *Carnine* (1953),

[1]Defendant's wife testified that, not knowing that Pryor was a police officer, she had been acquainted with him for about three months during the latter part of 1957; that Pryor made occasional social visits to her and defendant's apartment and sometimes went out with defendant; and that she once heard Pryor ask defendant to "go with him up to get some pod or weed, or whatever they called it. And my husband paused for a while and said he wouldn't like to do that, because he had children to raise and they were growing older now."

Defendant in his testimony admitted the transaction of December 11, 1957, and further testified as follows: About three months before that occurrence neighbors brought Pryor to defendant's home and introduced him as a schoolmate. (On cross-examination Pryor had previously testified that in his presence the neighbors did not refer to him as a schoolmate.) Pryor "started coming over, visiting with me, and we had a few drinks several times. And he asked me did I know where I could get some marijuana. And the first time I told him no, I didn't know anything about it. So he kept coming and kept asking and buying candy and stuff for my kids, and gained my influence; and so finally I decided—he told me him and his wife used it and he couldn't get any down here. . . . I told him that I would introduce him to the people, where he wouldn't have to come by and bother me to get it for him, because I didn't want to have anything to do with it. And I only did it because he was a friend." Defendant made no money from the transaction.

41 Cal.2d 384, 389 [4] [260 P.2d 16]; *People* v. *Frankenthal* (1949), 91 Cal.App.2d 189, 195 [2, 3] [204 P.2d 614].)

In support of defendant's application to produce evidence on appeal, an affidavit of defendant's trial counsel (who does not represent defendant on this appeal) avers that from discussions with Officer Pryor before and after the trial he believes that Officer Pryor would testify, in substance, "That defendant declined on more than two occasions to furnish or procure marijuana for said Officer Pryor before eventually agreeing to procure marijuana for him" and "That when the defendant procured the marijuana for Officer Pryor he stated to Officer Pryor in effect that if Officer Pryor again wanted to obtain marijuana through the defendant, defendant would introduce him to the person from whom he had obtained it." The affidavit further avers that trial counsel because of inadvertence did not establish the foregoing matters at the trial.

The legislation (Code Civ. Proc., § 956a) which gives appellate courts evidence-taking and fact-finding powers (pursuant to Cal. Const., art. VI, § 4¾) does not convert the appellate courts into triers of fact or abrogate the general rule that findings of the trial court based on substantial evidence are conclusive on appeal. The purpose of section 956a is to enable appellate courts, in appropriate cases, to terminate litigation by affirmance, or modification and affirmance, of the judgment, or by reversal with directions to enter judgment for appellant if it appears that on no reasonable theory could respondent make a further showing in the trial court. (*Tupman* v. *Haberkern* (1929), 208 Cal. 256, 269-270 [280 P. 970]; *Estate of Schluttig* (1950), 36 Cal.2d 416, 421-422 [224 P.2d 695].)

Defendant relies upon *Bassett* v. *Johnson* (1949), 94 Cal. App.2d 807, 812 [4] [211 P.2d 939], which bases a general reversal upon additional evidence received by the appellate court and announces that "where . . . the additional evidence is of such a nature that its effect on the appeal is decisive, such additional evidence, in the discretion of the court, can be and should be taken even though a judgment in favor of appellant is not directed." The Schluttig case (1950), *supra*, page 423 [1, 2] of 36 Cal.2d, holds that section 956a of the Code of Civil Procedure does not warrant an appellate court's general reversal of a judgment on the basis of newly discovered evidence presented in the appellate court and disapproves the contrary view of *Estate of Culver* (1947), 81 Cal.App.2d 640, 645-646 [184 P.2d 738]. In view

of the Schluttig decision, the above quotation from the Bassett case (1949), *supra,* 94 Cal.App.2d 807, 812 [4], cannot be considered to represent existing law.

Here the officer's testimony which defendant wishes to produce on appeal would corroborate defense testimony to the effect that defendant was reluctant to obtain the drug for the officer. Although the officer's testimony, because of its source, would no doubt have had greater probative value in the trial court than the testimony of defendant and his wife (see *People* v. *Carter* (1957), 48 Cal.2d 737, 748 [7] [312 P.2d 665]), an appellate court could not weigh the officer's testimony with the testimony which is transcribed in the record and conclude as a matter of law that defendant was more reluctant than the trial court found him to have been. Furthermore, the failure to adduce the testimony when the officer was on the stand at the trial is not sufficiently explained. Therefore, the application to produce additional evidence should be denied.

The People rely on the holding of *People* v. *Cowan* (1940), 38 Cal.App.2d 144, 153 [100 P.2d 1079], that "The constitutional provision [art. VI, § 4¾] and the code section [Code Civ. Proc., § 956a] do not apply to criminal cases." This court and other district courts of appeal have expressly or by implication declined to pass on the correctness of this Cowan holding. Instead, applications to produce additional evidence on appeal in criminal cases have been denied on the grounds that a jury trial was not waived (*People* v. *Carmen* (1954), 43 Cal.2d 342, 349 [7] [273 P.2d 521]; *People* v. *Mendes* (1950), 35 Cal.2d 537, 549 [9] [219 P.2d 1]; *People* v. *McKinney* (1957), 152 Cal.App.2d 332, 335 [3] [313 P.2d 163]; *People* v. *Willison* (1932), 122 Cal.App. 760, 762 [5] [10 P.2d 766]; *People* v. *Myers* (1932), 122 Cal.App. 675, 678 [3] [10 P.2d 498]), or that the evidence would be merely cumulative to or contradictory of evidence introduced at the trial (*People* v. *Lariscy* (1939), 14 Cal.2d 30, 33 [6] [92 P.2d 638]; *People* v. *Dutton* (1937), 9 Cal.2d 505, 507 [5] [71 P.2d 218]; *People* v. *Skelly* (1936), 5 Cal.2d 283, 287 [2] [54 P.2d 1]; *People* v. *Laisne* (1958), 163 Cal.App.2d 554, 559 [8] [329 P.2d 725]), or that defendant did not show that the evidence was unavailable at the trial (*People* v. *Mayes* (1947), 78 Cal.App.2d 282, 287 [3] [177 P.2d 590]). At this time it remains unnecessary to decide whether additional evidence could be produced on appeal in an appropriate criminal case.

Defendant urges that the California law as to entrapment

is the same as that set forth in *Sherman* v. *United States* (1958), 356 U.S. 369 [78 S.Ct. 819, 2 L.Ed.2d 848] ; that here, as in the Sherman case, undisputed testimony of prosecution witnesses establishes the defense as a matter of law; and that therefore, as in the Sherman case, the judgment of conviction should be reversed with directions to dismiss the indictment. Because defendant's argument in this regard involves the incorrect assumption, dangerous to California defendants who would invoke the defense of entrapment, that the prosecution can and should rebut the defense by evidence of defendant's prior criminal behavior or tendencies,[2] it is appropriate to review some differences between and similarities among federal law and California law as to entrapment. In the Sherman case the Chief Justice for the majority and Justice Frankfurter for the four concurring justices discuss three aspects of the law which are pertinent here, i.e., the rationale of the defense, the definitions or tests of entrapment which constitutes a defense, as opposed to proper setting of traps, and the type of prosecution evidence which can be admitted to rebut the defense.

The theoretical basis of the defense, according to the United States Supreme Court, is that "Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations." (*Sherman* v. *United States* (1958), *supra*, 356 U.S. 369, 372.) ▮ In California recognition of the defense is said to rest upon the broadly stated

[2]Petitioner Sherman was convicted of three sales of narcotics to an informer. Defendant here emphasizes the holding (pp. 375-376 of 356 U.S.) that the government had not "overcome the defense of entrapment" for the reasons, among others, that "There is no evidence that petitioner himself was in the trade," and that petitioner's "nine-year-old sales conviction and a five-year-old possession conviction are insufficient to prove petitioner had a readiness to sell narcotics at the time [the entrapping informer] approached him, particularly when we must assume from the record he was trying to overcome the narcotics habit at the time." Here, defendant points out, there is no evidence that he was engaged in the trade, he had only a prior conviction for the offense of possession committed seven years before the present offense, and there was no evidence that he had ever used narcotics. Defendant overlooks the fact that the People did not, and the law (hereinafter more fully stated) that the People could not, introduce evidence of past criminal involvement of defendant with narcotics to show that he was not improperly entrapped.

Also cited by defendant to show circumstances where a federal court will reverse on the ground that entrapment appears as a matter of law, and also emphasizing the government's failure to show defendant's criminal background or tendencies, are *Henderson* v. *United States* (1958, C.A. 5), 261 F.2d 909, 912, and *Morales* v. *United States* (1958), 260 F.2d 939, 940.

grounds of "sound public policy" and "good morals." (*People* v. *Makovsky* (1935), 3 Cal.2d 366, 369 [4] [44 P.2d 536]; *People* v. *Gallagher* (1930), 107 Cal.App. 425, 529 [290 P. 504]; *In re Moore* (1924), 70 Cal.App. 483, 487 [6] [233 P. 805]; *People* v. *Barkdoll* (1918), 36 Cal.App. 25, 28 [171 P. 440].) The precise nature of this public policy has not been spelled out in any California majority opinion concerning entrapment, but obviously California has recognized the defense for reasons substantially similar to those which caused this court, in *People* v. *Cahan* (1955), 44 Cal.2d 434, 445-446 [7] [282 P.2d 905, 50 A.L.R.2d 513], to adopt the rule that evidence obtained in violation of constitutional guaranties is not admissible; i.e., out of regard for its own dignity, and in the exercise of its power and the performance of its duty to formulate and apply proper standards for judicial enforcement of the criminal law, the court refuses to enable officers of the law to consummate illegal or unjust schemes designed to foster rather than prevent and detect crime. (See the concurring opinion of Justice Frankfurter in *Sherman* v. *United States* (1958), *supra*, 356 U.S. 369, 380; the minority opinion of Justice Roberts in *Sorrells* v. *United States* (1932), 287 U.S. 435, 454-455 [53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249] [quoted with approval in the opinions of Presiding Justice Shinn adopted as dissents in *People* v. *Braddock* (1953), 41 Cal.2d 794, 803 [264 P.2d 521], and *People* v. *Terry* (1955), 44 Cal.2d 371, 377 [282 P.2d 19]]; and the dissenting opinion of Justice Brandeis in *Casey* v. *United States* (1928), 276 U.S. 413, 423 [48 S.Ct. 373, 72 L.Ed. 632].) Although there is an instinctive sympathy for the originally well-intended defendant who is seduced into crime by persuasion and artifice, such a defendant is just as guilty where his seducer is a police officer as he would be if he were persuaded by a hardened criminal accomplice. Entrapment is a defense not because the defendant is innocent but because, as stated by Justice Holmes (dissenting in *Olmstead* v. *United States* (1928), 277 U.S. 438, 470 [48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376], an illegally obtained evidence case), "it is a less evil that some criminals should escape than that the Government should play an ignoble part." (Frankfurter, J., concurring in *Sherman* v. *United States* (1958), *supra*, p. 380 of 356 U.S.)

Nevertheless, the tests and definitions of entrapment stated by the California courts, like those stated by the United States Supreme Court, place at least as much emphasis on the susceptibility of the defendant as on the propriety of the methods

of the police. ██ Thus, common California formulations of the doctrine of entrapment state that the availability of the defense depends upon whether the intent to commit the crime originated in the mind of defendant or in the mind of the entrapping officer (*People* v. *Nunn* (1956), 46 Cal.2d 460, 471 [17] [296 P.2d 813]; *People* v. *Terry* (1955), *supra,* 44 Cal.2d 371, 372 [2]; *People* v. *Jackson* (1954), 42 Cal.2d 540, 547 [3, 4] [268 P.2d 6]; *People* v. *Braddock* (1953), *supra,* 41 Cal.2d 794, 802 [8]; *People* v. *Werner* (1940), 16 Cal.2d 216, 223 [4] [105 P.2d 927]; *People* v. *Makovsky* (1935), *supra,* 3 Cal.2d 366, 369 [4]), and that where a defendant has a preexisting criminal intent, the fact that when solicited by a decoy he commits a crime does not show entrapment (*People* v. *Malotte* (1956), 46 Cal.2d 59, 64 [4] [292 P.2d 517]; *People* v. *Terry* (1955), *supra,* 44 Cal.2d 371, 375 [4]; *People* v. *Braddock* (1953), *supra,* 41 Cal.2d 794, 802 [10]; *People* v. *Roberts* (1953), 40 Cal.2d 483, 489 [10] [254 P.2d .501]). Similarly, the United States Supreme Court says that the defense is available "when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute," but "the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment." (*Sherman* v. *United States* (1958), *supra,* 356 U.S. 369, 372, quoting from *Sorrells* v. *United States* (1932), *supra,* 287 U.S. 435, 442, 451.)[3]

██ The California courts say that "It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent people into a criminal career by its officers . . ." (*People* v. *Roberts* (1953), *supra,* 40 Cal.2d 483, 489 [9], quoting from *People* v. *Schwartz* (1952), 109 Cal.App. 2d 450, 455 [3] [240 P.2d 1024].) The United States Supreme Court says that "To determine whether entrapment has been established, a line must be drawn between the trap for the

---

[3]Manifestly, in the typical entrapment case, the intent to commit the *particular* crime with which defendant is charged, the crime in which the entrapping officer or other decoy participates, originates in the mind of the latter, although defendant may have had a general willingness to commit that type of crime whenever the opportunity arose. (See Frankfurter, J., concurring in the Sherman case, *supra,* p. 382 of 356 U.S.; Mickel, *The Doctrine of Entrapment in the Federal Courts* (1942), 90 Pa.L.Rev. 245, 251; Cowen, *The Entrapment Doctrine* (1959, Comment), 49 Journ. Crim. Law 447, 453.)

unwary innocent and the trap for the unwary criminal."
(*Sherman* v. *United States* (1958), *supra*, p. 372 of 356 U.S.)

From the foregoing statements of the doctrine of entrapment it might seem to follow that where defendant invokes the defense the prosecution may prove his willingness to commit the crime charged by evidence that he has committed other crimes of the same sort or that he has a criminal reputation. This is the federal rule. "[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." (*Sorrells* v. *United States* (1932), *supra*, p. 451 of 287 U.S.; *Sherman* v. *United States* (1958), *supra*, p. 369 of 356 U.S.)[4]

 In California, however, evidence that defendant had previously committed similar crimes or had the reputation of being engaged in the commission of such crimes or was suspected by the police of criminal activities is not admissible on the issue of entrapment. (*People* v. *Roberts* (1953), *supra*, 40 Cal.2d 483, 490 [13]; *People* v. *Makovsky* (1935), *supra*, 3 Cal.2d 366, 370 [5].)

A number of California cases state the view that where a defendant is *regularly engaged* in committing prohibited acts, it is no defense that an officer of the law furnished the opportunity for commission of the offense charged or, as is sometimes said, provided the occasion for defendant to ply his unlawful trade. But in none of those cases did the prosecution at the trial undertake to prove, for the purpose of re-

---

[4]"Not only do the federal cases hold that the prosecution may prove that defendant was a criminal in order to show that he was not improperly induced to commit the crime charged; some of them go so far as to frankly state that the police may use more reprehensible methods to trap those whom they reasonably suspect of being engaged in crime than they may use against the ordinary citizen. For example, it is said in *Trice* v. *United States* (1954, C.A. 9), 211 F.2d 513, 516 [1], cert. den., 348 U.S. 900 [75 S.Ct. 222, 99 L.Ed. 707], "Here we have a government agent using a consumptive narcotic ex-convict of ill repute to double-cross a friend. Here is entrapment in fact . . . The question is: Is it illegal entrapment and the answer to that question is to be found in the testimony of the narcotic agents on whether they had reasonable grounds to believe that Trice was predisposed to engage in the illicit traffic." This view seems difficult to reconcile with our fundamental concepts of governmental fairness and equal protection of the law. In effect it permits the police to obtain conviction of a once rehabilitated criminal whom they have badgered into resumption of crime, whereas a man of blameless past, similarly induced, could not be convicted. (And *cf.* *People* v. *Cahan* (1955), *supra*, 44 Cal.2d 434, 439 [5]: "it would be manifestly impossible to protect the rights of the innocent if the police were permitted to justify unreasonable searches and seizures on the ground that they assumed their victims were criminals.")

butting the defense of entrapment, that defendant was engaged in an unlawful trade. Rather, the opinions in those cases indicate that the appellate courts arrived at their conclusions that defendant was regularly engaged in lawless activity because of the readiness with which he committed the crime charged (*People* v. *Ramos* (1956), 146 Cal.App.2d 110, 113 [5] [303 P.2d 783]; *People* v. *Caudillo* (1955), 138 Cal. App.2d 183, 186 [291 P.2d 191]; *People* v. *Neal* (1953), 120 Cal.App.2d 329, 333 [5] [261 P.2d 13]; *People* v. *Branch* (1953), 119 Cal.App.2d 490, 494 [3] [260 P.2d 27]), or from defendant's own testimony or extrajudicial admissions (*People* v. *Caudillo* (1955), *supra*; *People* v. *Raffington* (1950), 98 Cal.App.2d 455, 460 [9] [220 P.2d 967]; *People* v. *Cherry* (1940), 39 Cal.App.2d 149, 153 [102 P.2d 546]), or from the court's view that "the offense is one of a kind habitually committed" (*People* v. *Schwartz* (1952), *supra,* 109 Cal. App.2d 450, 455 [4], quoting from 22 C.J.S., Criminal Law, § 45, p. 102). In *People* v. *Schubin* (1958), 166 Cal.App.2d 267, 270 [3] [332 P.2d 737], where there was evidence of defendant's prior wrongful and suspicious conduct, such evidence was admitted as part of the prosecution's case in chief, to show criminal scheme and method, not to show that it was proper to entrap defendant because she was already a criminal. And in *People* v. *Herrera* (1959), 171 Cal.App.2d 551, 557 [340 P.2d 690], hearsay evidence tending to show criminal activity (the entrapping officer's testimony that an informer told him that defendant "had been talking to him about narcotics") came in during the People's case in chief simply as part of the officer's description of the events leading up to the crime, not under the view (expressed by some federal courts) that the officer could justify entrapment by showing that he "had reasonable grounds to believe that [defendant] was predisposed to engage in the illicit traffic" (*Trice* v. *United States* (1954, C.A. 9), *supra,* 211 F.2d 513, 516 [1]).

Since the prosecution in California cannot prove prior criminality of defendant to overcome the defense of entrapment, the absence of such evidence here does not in and of itself have the significance which it had under federal law in the Sherman case (1958), *supra,* 356 U.S. 369. Our inquiry is not, as defendant's argument suggests, whether the prosecution has "overcome the defense of entrapment" (p. 375 of 356 U.S.) but, as he states elsewhere in his briefs, whether the prosecution evidence as a matter of law shows entrapment.

From the testimony of Officer Pryor, the dates of

the relevant occurrences, and common knowledge of the methods of those engaged in the narcotics trade and of narcotics officers, the following picture quite clearly appears: The fair purport of the officer's testimony is that he obtained an introduction to defendant, cultivated his acquaintance for a month and introduced the subject of narcotics into their conversation, then on December 10, 1957, asked defendant if they could purchase marijuana the next day, and on December 11 afforded him the opportunity and means to obtain marijuana for the officer, all pursuant to the officer's investigation into traffic in the weed.[5] That the principal purpose of the government was not to obtain evidence of this defendant's relatively trifling procurement of 43 grams of marijuana solely for the officer on December 11 is indicated by the fact that not until April 15, 1958, did the People obtain an indictment charging that more than four months before, on December 11, 1957, defendant ''did . . . feloniously sell, furnish and give away . . . marijuana.'' This indictment was secret. Upon its return a bench warrant issued and bail was set at $5,000. On April 22, a week after the return of the indictment, the police for the first time officially questioned defendant as to the December transaction and defendant for the first time learned that Pryor was a police officer. Defendant (perhaps because of fear for his own life or for the safety of members of his family, perhaps because of mistaken loyalty) refused to divulge the identity of the peddler from whom he had obtained the drug for the officer. Thereupon, on April 30, 1958, he was arraigned in the superior court and remanded to jail. The above described overall picture strongly suggests that the government may well have been using defendant as an unwitting decoy to bag larger game rather than merely to induce him to commit an act for which he could be prosecuted.

---

[5]Although we are primarily concerned with the officer's *conduct* as constituting excessive persuasion, not with the officer's state of mind, it is to be noted that the just stated circumstances are ''quite persuasive'' that the officer believed that defendant had some knowledge of illicit drug traffic which would enable the officer to detect and apprehend persons engaged in the traffic. (See *People* v. *Makovsky* (1935), *supra*, 3 Cal.2d 366, 371; *People* v. *Farrara* (1956), 46 Cal.2d 265, 268 [3a] [294 P.2d 21].) We cannot assume, in the face of the presumptions of innocence of wrong, regular performance of official duty, and obedience to law (Code Civ. Proc., § 1963, subds. 1, 15, 33; see *People* v. *Farrara, supra,* p. 269 of 46 Cal.2d; *People* v. *Citrino* (1956), 46 Cal.2d 284, 287 [2] [294 P.2d 32]) that the officer's dealings with defendant had as their purpose the manufacturing rather than the investigation of crime.

Attention is directed to section 11710 of the Health and Safety Code, which provides, ''All duly authorized peace officers, while investigating violations of this division [which concerns narcotics] in performance of their official duties, *and any person working under their immediate direction, supervision or instruction,* are immune from prosecution under this division [which includes section 11500].'' (Italics added.) We think that in their context the words ''direction, supervision or instruction'' denote authority. Defendant, when he furnished Pryor with the drug, did not know that Pryor had any authority. Rather, it appears from the prosecution evidence that defendant intended to, and believed that he did, obtain the marijuana for a mere acquaintance in response to a mere request; that is, defendant's intent was to ''furnish'' marijuana as prohibited by section 11500, not to operate as a government agent, decoy, or informer immune from prosecution under section 11710. Insofar as is material to defendant's intent, Pryor did not under color of his office direct or instruct defendant to furnish the narcotic, but, appearing to act merely as a private citizen, only asked him to do so. Nor did Pryor supervise defendant's obtaining of the weed; rather, he gave defendant money and simply observed defendant leave the automobile with the money and return in half an hour with the marijuana.

The suggestion that Officer Pryor, unknown to defendant, made defendant his agent to detect and apprehend the peddler from whom defendant obtained the weed is somewhat similar to an argument presented in *People* v. *Seely* (1944), 66 Cal. App.2d 408, 412 [152 P.2d 454]. In that case officers for some days stealthily observed a peddler of marijuana plying her trade. Immediately after she made a sale to the defendant and another person, the three were arrested. Since the officers did not participate in any of the narcotics transactions, but merely watched them unknown to the criminal participants, the defense of entrapment could not be invoked. Defendant, however, invoked ''public policy'' and argued that ''in knowingly permitting the peddler . . . to continue her traffic after having ascertained her vocation the state became her partner.'' The appellate court correctly held that the facts showed no violation of the public policy of this state, and pointed out that '' [2] as protectors of society it is [the officers'] duty to suppress crime by the employment of any legal, reasonable stratagems. [3] In attempting to defeat illicit dealers in narcotics the police are justified in assuming that a salesman has

associates or employers or vending customers. On such assumption it is their duty to endeavor to eradicate the entire tribe by judicial process. Such was the course pursued by the officers in the preparation of this case. They violated no rights in attempting to ascertain the extent of the operations of the suspect by detecting a number of sales . . ." Similarly here, viewing the evidence favorable to respondent, the officer in his attempt to detect a narcotics operation simply gave defendant the opportunity to commit a crime, a "legal, reasonable stratagem" which did not constitute the defendant an agent of the officer or make defendant's intent constructively the same as the intent of the officer.

We disagree with the further statement in the Seely case, unnecessary to the decision, that (p. 412 of 66 Cal.App.2d [4]) "The conduct of arresting officers is of no concern to the courts so long as their behavior does not tend to influence the judicial inquiry into the merits of the accusation against the prisoner by violating his rights of due process of law. (*McNabb* v. *United States*, 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819].)" To the contrary the McNabb (1943) decision (which holds that confessions obtained by officers while they illegally detained defendants without bringing them before a magistrate are not admissible in the federal courts) was expressly based, not upon due process, but upon the view that "Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as 'due process of law' and below which we reach what is really trial by force." (P. 340 of 318 U.S.) Similarly, California bases exclusion of evidence obtained by unconstitutional search and seizure, not upon due process, but upon the court's "regard for its own dignity as an agency of justice and custodian of liberty." (*People* v. *Cahan* (1955), *supra*, 44 Cal.2d 434, 441, 445.)

The punishment to which this defendant has been sentenced is imprisonment from 10 years to life, for section 11713 of the Health and Safety Code prescribes that punishment for "Any person convicted under this division for . . . furnishing . . . any narcotic" where he "has been previously convicted of any offense described in this division" and the previous conviction is "found to be true by the court." This punishment seems very harsh for a defendant who, without

benefit or profit to himself, furnished the comparatively small amount of marijuana obtained by this defendant at the request of and for the officer, and who had suffered a conviction for possession of marijuana seven years before. Section 11713 prescribes the same punishment for the professional peddler who has suffered a prior narcotics conviction and who viciously preys upon the ignorant, weak, and addicted. The law in this respect—in taking from the trial judge initially and from the adult authority ultimately the power to exercise with broader scope an informed and constructive discretion as to fitting punishment—appears to be a regrettable throwback toward, if not to, that less enlightened era before the dawn of the indeterminate sentence concept. However, as the trial judge aptly stated when he imposed sentence, ''until the legislature sees fit, or the People of the State of California see fit, to change the laws, it is my duty as a judge and under my oath to follow the laws as the People of the State of California have made them.''

For the reasons above stated the application to present additional evidence on appeal is denied and the judgment is affirmed.

Gibson, C. J., Traynor, J., Spence, J., McComb, J. Peters, J., and Peek, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.