[Crim. No. 7358. Second Dist., Div. Three. Mar. 23, 1961.]

THE PEOPLE, Respondent, v. FELIX GEORGE
D'AGOSTINO, Appellant.

Thomasset & Thomasset, Charles A. Thomasset and Alfred Lubin for Appellant.

Stanley Mosk, Attorney General, and George W. Kell, Deputy Attorney General, for Respondent.

VALLÉE, J.—By indictment defendant was accused of offering to sell, furnish, and give away heroin. (Health & Saf. Code, § 11501.) A jury found him guilty as charged and he was sentenced to state prison. He appeals from the judgment.

In February 1956 the Federal Narcotics Bureau initiated an investigation of defendant. Agent Benedict Pocoroba rented an apartment in a building owned by defendant's father in Manhattan Beach. In doing so, Pocoroba used the name Anthony Rizzo, made the acquaintance of defendant, and had numerous conversations with him. Throughout the contacts between federal agents and defendant, Pocoroba was known as Rizzo. On April 7, 1956, defendant told Rizzo there was a 32-carat diamond in France which could be purchased for $10,000, but $2,000 or $3,000 would be needed to go to France to get it. Rizzo said he did not know anything about diamonds. They talked about the D'Agostino family. Defendant said his Uncle Antoine made money smuggling narcotics for friends in the United States; that once he was arrested in New York under the name Cisco, and as soon as he was free on bond he absconded. This was the first mention of narcotics between defendant and Rizzo. They talked about the price of heroin. Defendant said the current price of heroin in France was between $2,500 and $3,000 a kilo, and that would mean the price in the United States. A kilo is 2.24 pounds. Rizzo said that roughly it would be sold for $10,000 if it was pure. De-

fendant said he had done some heroin smuggling for his Uncle Albert between France and Italy.

On cross-examination Pocoroba-Rizzo testified: "Q. And you represented to them [the D'Agostinos] that you were retired? A. That's right. Q. And you represented to them that —and to Felix—that you had been a narcotics peddler? A. After he started the subject, yes. Q. When was the first time that anything about narcotics was ever mentioned? A. It was on April 16th, 1956. Q. Well, where did that take place? A. In my apartment. Q. Was it the daytime, or the nighttime? A. In the afternoon. Q. Well, up to that time had you made any representations to either Mr. or Mrs. D'Agostino or to Felix D'Agostino as to what your occupation had been? A. No, sir. Q. Nothing at all discussed about that? A. No, sir. . . . Q. All right. Well, tell me now, what you claim Felix [defendant] said to you on that date? A. First he said he had all kinds of connections in France about narcotics and about counterfeit money. Q. And about what? A. Counterfeit money. Q. Yes. A. And then he asked me if I knew anything about narcotics. Q. What did you say? A. I said that I had been in that business, I had made mine; but since my wife died, I quit. Q. Well, now, this was the first thing he said to you, that he had connections in France, all kinds of connections in France about narcotics? A. Yes, sir. Q. What had you been talking about before he mentioned that? A. About a diamond, a 30 carat diamond that was in France, that could be bought for ten thousand dollars. Q. Nothing previously had been said about narcotics? A. No, sir. Q. And then you told him that you had been a narcotics peddler? A. That's right. Q. Did you tell him that you had made a lot of money in it? A. That's right. Q. Well, did you tell him that these connections might be valuable to both of you? A. No, sir, I told him I was out of the business. Q. You wanted nothing whatsoever to do with it? A. That is right. Q. What did he say then? Did he drop the subject then? A. Yes, sir. Q. So that was all he said on that day, was that he had connections in France, all kinds of connections in France, where he could get narcotics, is that right? A. That's right. Q. Now, that was in April? A. Yes, sir. . . . Q. By Mr. Sullivan [attorney for defendant] : Oh, incidentally, in some of these conversations that you had with Felix, you told him that you had a friend of yours in the narcotics business who was getting narcotics from Mexico, didn't you? A. Well, it wasn't that way. He asked me if I knew somebody that was interested in heroin, and I told

him that I knew a guy that was in the business but he was getting Mexican heroin and didn't like it very much. Q. And what? A. He didn't like it. Q. Well, did you tell him you were going to get in touch with that man? A. I did. Q. Now, you learned at one time, some time during the month of October, 1956—this was within five or six weeks after you returned from Philadelphia—that Felix himself was endeavoring to borrow the sum of $4,000 to use towards the purchase of an apartment house, didn't you? A. Yes, sir. Q. And he had talked to you as to whether or not you knew of anybody who might loan him this four thousand dollars, didn't he? A. That's right. Q. Then some time along about the 23rd of October he came to your apartment and asked you if you had had any luck in finding a lender for him? A. That's right. Q. And you told him that you hadn't had any luck? A. Yes, sir. Q. Well, then, when you told him that you hadn't had any luck, you suggested to him, you said in substance and in effect, 'Well, if you really know what you're talking about you could get a couple of kilo's [sic] of heroin brought here, and that would give you a sizeable amount of money'? A. That's right. Q. You suggested that to him? A. That's right. Q. And he told you at that time that he had dismissed that idea completely from his mind? A. That's right. Q. That he didn't want to have anything whatsoever to do with it? A. He said he dismissed the idea. Q. You didn't discuss the matter with him thereafter, at any time? A. Will you repeat the question? Q. Well, it's probably a little confusing; I will withdraw it. After the 24th of October, when Felix told you, or when you suggested to him that if he got a couple of kilos of heroin he could get a sizeable profit, and he told you that he had dismissed that completely from mind, wanted to have nothing whatsoever to do with it, or words to that effect, that's what he told you? A. Yeah. Q. And thereafter, you had no further discussion with him about that subject matter? A. No, sir.''

Refreshing his memory from a report he had made to the Federal Narcotics Bureau dated April 16, 1956, Pocoroba also testified: ''Q. Calling your attention to a report dated April 16, 1956, paragraph 2—this refers to a conversation on or about April 16th, 1956—did Felix D'Agostino state to you in substance that he could not be happy working at his trade, working as an electrician? A. That's right. Q. And in substance he preferred the carefree night life of Paris, with plenty of money easily gained? A. That's right. Q. And did he then

discuss with you a certain 30-carat diamond ring? A. Yes, sir. Q. Did he thereafter tell you that he had all sorts of connections in France for narcotics and counterfeit money? A. Yes, sir. Q. Directing your attention to a report of May 3rd, 1956, referring to a conversation apparently on or about the same date, Paragraph 2, did you ask Felix D'Agostino what he meant by 'pulling a big deal,' and did he answer in substance, 'Oh, eight or ten kilos'? A. Yes, sir. Q. And did you then ask him how he could get it, and did he reply that there's plenty of heroin in France, or at least there was plenty up to the time he left France a little more than a year before? A. Yes, sir. Q. Did he later state, in substance, that with ten thousand dollars he could purchase eight or ten kilos of heroin? A. Yes, sir. Q. Did he then explain in substance that that was not the full price, but that the source in France would be secured against losing their principal if they had that much money? A. That's right. Q. Calling your attention to the report of October 24, having to do with a conversation of Tuesday night, October 23rd, 1956—incidentally, all of these refer to conversations in your apartment, is that correct? A. Yes, sir, most of them. Q. Well, this one in particular, is that correct? Did he state to you in substance at that time— that is, October 23, 1956—that he had completely dismissed the idea of dealing in narcotics since he had learned that his Uncle Antoine was in prison and that he felt sure that his Uncle Albert and his father were being watched? A. That's right.''

Pocoroba retired from the Bureau January 1, 1957, left the apartment in February 1957, and moved to Pennsylvania where he resided in Darby and in Woodland.

In the latter part of May 1959 Howard W. Chappell, agent in charge of the Los Angeles office of the Federal Narcotics Bureau, telephoned defendant, told him his name was Jimmy White, and passed on some regards which he supposedly had received from Pocoroba. On July 9, 1959 Chappell went to defendant's home. He introduced himself to defendant, told him he was the man who had called him, passed on the regards from Pocoroba, and said, " 'I have just again returned from the east where I visited with Mr. Rizzo [Pocoroba]. He wants me to extend his regards to you and he mentioned that I might bring up a delicate subject with you or discuss a delicate subject with you. . . . It's a subject which you and he have discussed.' '' Defendant said, " 'Well, I know what the subject is, and we may be able to do something; but first I want to know Mr. Rizzo's' '' address. Chappell said he did not have it

with him, that he had it at home and would telephone it to him. The next day Chappell telephoned defendant and gave him Pocoroba's address.

On July 10, 1959, defendant wrote the letter quoted in the margin to Pocoroba in French.[1] On July 15, 1959, Pocoroba answered defendant's letter, sending a copy to Chappell. It is quoted in the margin.[2]

---

[1] "Manhattan 7-10-59

"Felix D'Agostino
"Dear Mr. Ritzo:—

"I write to you today a sunny and very hot California's day, as you know.

"Do you intend to again spend some time in California on the beach; if so, let me know.

"I must tell you that we have sold the house where you spent your vacation, but if you will need a service don't hesitate, it would be a pleasure to do something for you.

"Did you have a good vacation in Europe, I hope so, I would like to have a long conversation with you like we did in the past, but, alas, a letter is so short and it isn't exactly like talking, that is why I would have wanted to telephone you but I don't have your telephone number; perhaps you will prefer to telephone me, as you choose.

"Ah, I was forgetting, a friend of yours came to see me and spoke to me about you. I don't remember his name but he is big with black eyes and brown hair, you must know who he is. I would have liked to see him again but I don't know his address, may be you will render me this service.

"Another thing I would like to ask you the address of the store where we used to b[u]y the wine and the anisette, I have forgotten it completely.

"Now I leave you, hoping to receive an answer from you real soon.

"I embrace you affectionately.

"Felix."

[2] "Darby, Pa. 7-15-1959.

"Dear Felix:

"It was a great pleasure for me to receive your letter and I was very glad that you haven't forgotten me. I would have written to you from Italy, but I don't know what I did with the small book of addresses and telephone numbers.

"How are your father, your mother and Zizette? You didn't mention them.

"My friend, Jim White is a very good fellow and perhaps you two will come to an agreement; but I don't know where he lives right now.

"Next winter I hope to come back to California and thanks for your kindness. Then we will chat like before.

"I don't remember the address of the store where we used to buy the wine and the anice, but the name is San Antonio Winery and you will find it in the telephone book.

"This will be all for this time. Greetings to your family and to you.

"Your friend
"Tony Rizzo
"Darby, Pennsylvania."
"16 Creek Ave.

On July 20, 1959, Chappell telephoned defendant and told him he (Chappell) had been in Mexico and had just returned. Defendant said he had received a letter from Pocoroba and " 'Although I received this letter from Mr. Rizzo, I don't remember you. I don't remember you coming down to the apartment.' " Chappell said he used to go down to Pocoroba's apartment and that they had parties there, which was the fact. Chappell told defendant he would see him that night.

Chappell went to defendant's home that night. Defendant said that although he had received the letter from Rizzo, he had no way of knowing whether Rizzo was in jail and asked Chappell whether he had a telephone number for him. Chappell went to his car, returned, and gave defendant Pocoroba's telephone number. On receiving the number, defendant said the delicate subject " '[t]o which you referred to, is heroin, is that not correct?' " Chappell said, " 'Yes, that is correct.' " This was the first mention of a narcotic between defendant and Chappell. Defendant stated he would have to go to France to get more details about it, he was not sure of the price, and he would have to go to France to make arrangements. Chappell asked defendant if it was not possible that his connections might have a distributor in the United States or Canada or Mexico from whom he might obtain heroin. Defendant said no, it would be necessary to go to France; he believed they would be able to get 5 kilos; Chappell would have to pay for 2 kilos, and 3 kilos would be given them on consignment; after "getting rid" of the 5 kilos they would make only one more deal, and that for 20 kilos; after the 20 kilos were disposed of they would go out of business. Defendant asked Chappell for a telephone number and Chappell gave him two undercover numbers.

Chappell went to defendant's home again on July 22 in response to a telephone call to one of the undercover numbers. Defendant "brought up the question of expenses involved in the trip to France." Chappell told him that as far as the trip was concerned the expenses would have to be his, that he (Chappell) would have his expenses taken out of his "end." Defendant asked what they might expect to get out of the heroin. Chappell said it would be his intention, with pure heroin, to adulterate it 50 per cent and sell each kilo for $15,000. Chappell suggested that rather than 5 kilos on the first deals they take 2 and they "would first find out how good the connection was and how reliable it was and how the deal would go down." Defendant said, " 'Well,

there's no reason to worry about the connection, that the connection could furnish 50 kilos into the United States if the traffic—— if we had the market for it.' '' Defendant further said that on the 2 kilos, Chappell was to pay for them outright and the profit would be all theirs, that on the 3 kilos to be obtained on consignment they would have to split four ways with two people from Marseille; the 3 kilos would be divided into 6 and sell, roughly, for $90,000; that he would just tell the people in France they were going to make a profit of $15,000 for 3 kilos, which made $45,000; they would keep $22,500 and they would be making the additional $45,000 on the 3 kilos that they made, and the people in France would not "know about that." Defendant did not tell Chappell how he would get the heroin into the United States. He asked Chappell if he knew Jean Leget, Michele Cisco, and a man named Canuto. Chappell knew Leget as the "Silver Fox" in international narcotics, that Cisco was defendant's uncle and that he was incarcerated "for narcotics." He did not know Canuto.

Chappell saw defendant again at the latter's home on July 28. Defendant said he had received a letter from France that the price of heroin had gone up considerably; it was much higher than it had been when he previously had knowledge of it; it was possible the man who smuggled the heroin into the United States would be an additional $5,000 and that they might take delivery in Canada rather than the United States; that the last he knew the price was around $2,500 a kilo but it might be as high as $4,000, possibly $5,000. Chappell asked for more information about the price he would have to pay. Defendant said he did not know, he would have to write another letter, it was not at all clear to him. He said "there might be some restrictions on the first five kilos, that it might be necessary for him to come back to the United States with the five kilos and for him to retain custody of the unpaid for or the consigned heroin; and that as I paid him off, then he would give me another kilo."

Chappell went to defendant's home again on August 7. He had a small portable radio concealed on his person which transmitted a conversation about "a block to two blocks, maybe three blocks under good conditions." Two other agents were outside on the receiving end. Defendant said, "What's the matter with Don." Don was another agent who answered the undercover telephone when defendant called. Chappell replied: " 'Well, you've got Don mad. You called him the

other night and started asking him a lot of questions about me. You asked him where I lived, what kind of work I did. . . . I explained to you that that phone number was a "drop," and that the person at the phone number knows nothing except my name is Jimmy, and if Felix calls for me let me know. . . . You started prying and asking a lot of questions, and Don just wasn't going to tell you anything. He wasn't acting funny, he just told you if you wanted to know the answer to these questions, you should ask me.' " Defendant said he had the plane tickets. Chappell said he had received a telephone call from some friend in New York and " 'Apparently while I have been getting some of my customers up, some old friend of mine in New York had heard about it and I think this man who wants to see me in New York will probably be able to supply me with all the heroin I want.' " Defendant said, " 'Well, no, don't do any business in New York, because the price will be much better in France and I have my tickets." He showed the tickets to Chappell, who read them aloud so the men at the other end of the radio could get the information. Defendant said he wanted $400 or $500 for expenses in France. Chappell said he would meet him in New York and at that time let him have some money for expenses. Defendant said, " 'Well, as long as you're going to go to New York, why don't you use the telephone here to make your reservations.' " Chappell telephoned to the airport and made a reservation. Defendant asked for Chappell's address. Chappell gave him the address of his secretary.

Chappell telephoned defendant in the late afternoon on August 10, said he had been out of town, he was on his way back, there was illness in his family, and he would not be able to get in before defendant left. Defendant left for New York that night. The same night Chappell sent defendant a telegram reading: "My mother's sister has passed away and I will be unable to come to New York. I suggest that you proceed; as soon as you arrive in France, send me your address airmail and I will send you the information I was supposed to give you in New York." Defendant went on to France.

Prior to leaving for France defendant told Chappell to send correspondence to him at Juan-les-Pins, France, and they agreed they would use code names for heroin or narcotics.

On August 19, 1959, Chappell received a letter from defendant which in part read:

"Dear Robert

". . . I will do for you what you intended to do yourself—and you may ask me anything you want from here, one thing only you will have to send me—the money—because I have just enough for myself and everythings here is more expensive than we were thinking—it will be a good thing if you send me a thousand and if there is any change I will bring *them* back with me, you understand—— I did not see too much of Paris yet and I will let you know all the nice things *who* will hap[p]en to me, I hope it will not be anything bad—— . . .

"I cannot tel[l] you everything I did yet because I like to take my time. I tel[l] you only that her name is Jeanine, beautiful girl—and I do not know how much she will cost me, I hope not too much, and as long as I have a good time, it is worth*ed* don't you think so——

"Well, I will stop know and hope that a good he[a]lth be with you—say hello to your wife for me——

"Sincerely,

"*Georges*

"P.S. I will give you my address as soon as I can——"

On August 25 Chappell received another letter from defendant which read:

"La 20-1959

"Dear Robert——

"I had a very good time, but I am out of money and I would like to stay*s* a little more here——

"I have a very good time with Jeanine and now I know her better——and am sure that she will not cost me more than 6,200 per night. I will have to as/d 5,000 for the room. I will have to spend 2 night[s] ½ and she will spend the rest*e*——all together it will cost me 21,500. I think it is very good——

"I am not very sure yet, but it is close—— I am working very hard for it, I will explain when I come back——

"One thing for sure I need 1,000 right a way.

"I hope that you will do the *necessaire* the right way—and fast—— I do not know what else to say—but I am sure that we will talk more about my happiness when I will come back——

"Now it is your turn to speak—like you told me—and I hope that you are happy as I am——

"Here is my address:

>"Eugenio Canino
>"Villa Marina-Le Trianon
>"Juan-Les-Pins
>"A.M.
>"France

"I will said goodbye now and hope to [h]ear from you a soon as possible——

*"Georges"*

On August 26 Chappell sent a letter to defendant which in part read:

"Dear Friend

". . . I do not understand your letter. Also I am obligated to take care of our business here & the people are becoming impatient. It is necessary that we try to complete our business without un[n]eccessary delay. from your letter it appears that the merchandise is $6,200 per unit. Also that it will cost $5,000 to handle the shipping cost. This is very high. I trust that *that* you are making the best arrangements possible, please write to me immediately & explain the exact cost & what we will receive for the money.

"Also, I am confused about your address. Is Eugenio—Canino the name you are using?—or is it part of your address. You did not give me any idea you would use that name——and I know nothing about France so I am confused. I have *all* the money ready for you *now*. Since I do not know for sure about this address, I will mail this letter. Write to me immediately & explain about the address & name. As soon as you write back I will know you received this letter and I will know I have the address correct. I have my arrangements completed. I will assure you that within 72 hours or less, after I receive your confirmation, the necessary funds will be in your hands. Please furnish me with the total cost of the merchandise in your letter and the rest of the information.

"Best regards & wishes for a very pleasant and enjoyable trip.

>"Your friend
>"Robert.

"P.S. I believe it will be possible to send the money in

a better way than your friend you mentioned in San Francisco since with large amounts of money they might be curious.''

On September 9 Chappell received a letter from defendant which in part read:

''Le 5-1959

''Dear Robert—

''. . . Now for what you ask me—it is right—6.2 per unit—and 5. to bring it back—you know also that it will have to be five units so it can be done.

''So for all it will cost 36. + that I need for myself——

''But I made the arrangement for one half—to pay and the rest later—so you will have to send me 20.5 when I will tel[1] you not before it is very important— for now I need one thousand as soon as possible—to start what I need to do like I told you before——

''Without that nothing can be done I have to go somewhere and financially I am force[d] to stay with my family——

''for the address it was something of no importance—am giving you an other one so you can send me the one thousand *only*. . . .

''*Georges*

''Eugenio Canino
 Judo Beach
 Toi et Moi
 Juan-les Pins
 A.M. (France)
''P.S. Do just like I said——''

The same day, Chappell sent this letter to defendant:

''Dear George

''I received your letter today. I am disturbed about the price of the suits you are buying. Also there is too much delay. In order to keep my bargain I am sending you $1,000. Also I know that these vacations are expensive. However the distance makes plans very slow. It takes a week to get a letter.

''I am very fortunate to have a very trustworthy close associate. His name is Anthony Russo. He is an actor in the movies and television. You may remember his face from television when you see him. He is a very dear friend and absolutely reliable. I have ask[ed] him to visit with you in order to deliver the money to you.

"Please extend every courtesy to him just as you would to me. He has my authority to make any decisions you and he have to make. He will also be in a position to do everything you want. I wish you would plan with him to decide if we would profit more if we pay for everything instead of taking half on consignment. Also would we not get a better price?

"Anthony will be in France when you get this letter. I have furnished him with ½ of a card. I am sending you ½ of the card so that when you meet he will not talk to you unless you have your piece of card.

"He is a very good judge of cloth and is very experienced in making suits and dresses. Because of his excellent reputation in Hollywood and New York—he is above suspicion.

"Please appreciate my position and expedite the negotiations so that I will not lose my standing with my associates here. They are becoming difficult because of the delay. Best regards.

"Robert."

Anthony Russo was a federal narcotic agent. He met defendant in Paris. Defendant demanded $1,000 of him. When Russo refused to give him any money until he saw a sample of heroin defendant would not talk to him any further.

On September 16 Chappell sent this cablegram to defendant:

"EUGENIO CANINO
 JUDO BEACH
 TOIETMOI
 JUAN les pins
 A.M. FRANCE

 "ANTHONY PHONED ME ABOUT HIS TROUBLES WITH YOU STOP HE ACTING ON MY INSTRUCTION SO MONEY WILL BE GIVEN YOU ONLY AFTER YOU GIVE HIM CLOTH.

"REGARDS<br>"ROBERT."

On October 7 Chappell received this letter from defendant:

"Dear Robert——

"I just happen to know that you call[ed] in my appartment to find out if I was there—— I do not know what you want? You know more than I do that you have kill[ed] the deal when everything was ready and perfect——

"Maybe you want to know why? Let me tel[l] you the principal ones—— First you did not send the money I needed as *convenu*——

"secondly I did not want to know anyone as *convenu*

"and third you knew about the price before I was going and after by mail. You said that the money was in your hands—ready as soon as possible—— You even said: 'I trust that you are making the best arrangement possible——.'

"So as you see I did everything as we said before and nothing else . . .

"Know I hope you did not forget our deal even so it is not my fault that the deal is off——

"You remember that if I could not find anything or else the expenses I had *was* to be half and half——

"Maybe I did trust you a little to[o] much ——

"Anyway it is a pleasure for me to find out what will do a big man (your friend tol[d] me) about that?

"I think it is enough for now—and let me tell you that you do not have to worry for me; I will find a way to pay my expense that I had in a French riviera and I have a father very *understandle* so you see I will be back ——

"Good by ——

"*Georges*

"P.S.: By the way if you want to answer the address will be: Buschiazzo Simon 1 rue Sadi-Carnot — BONE (ALGERIE) N/A"

On October 14 Chappell sent this letter to defendant:

"Dear Felix

"I was happy to get your letter but disturbed about your attitude. You blame me because the deal did not go when it is all your fault. You have tried to handle a difficult and dangerous operation like a child. You told me you were familiar with *with* the merchandise. Still you were allowing us to either being cheated or else your friends think we are damned fools.

"For your information I recently—after *you* failed—obtained four kilos of *pure* for $36,000 delivered to me in Los Angeles. I was furnished with a large sample and had 24 hours to test. The deal was completed in a business like manner. Reputable businessmen·do not act the way you did. The way you wanted me to·send the money was dangerous.

"Also you told me that the price would be 2500 or 3,000 per kilo. I check[ed] and found out ·that the price *there* shud [*sic*] not be over 3,000 if the source is a good one and reliable.

"I now believe you do not know anything about the business. I notice you have gone to Algerie where you told me your father lives. I assume that this is what you intended to do in the first place. You were just trying to get enough money from me to help pay your expenses.

"You are lucky I am considerate. Tony reported to me that you made some threats because I did not order him to give you the money.

"He was prepared to give you 1000 or as many thousands as necessary if the deal had been right. He did right in *not* giving you anything when you made it obvious you did not know what you were doing.

"Good-by

"J."

On November 19 Chappell telephoned defendant's home and was told defendant was home.

Defendant testified. He sought to have it appear that the idea of his obtaining heroin and selling it originated with Pocoroba and Chappell. He agreed there was a conversation with Chappell about his going to France and how the narcotics were to be brought into the United States. He admitted: He told Chappell he would "take charge of that to get it to the United States"; he told Chappell the price had gone up and there would be a courier fee; he told Chappell he had his plane ticket; the word "Jeanine" was a code word meaning "the narcotic"; "6,200 per night" meant "6,200 for a kilo"; he met Anthony Russo in France. Defendant also admitted: He told Chappell he would go to France as quickly as possible; he told Chappell he was going to France to get heroin; Chappell read the airline tickets; Chappell asked him how to get the money to France; he told Chappell the money would be sent through Deak and Company in San Francisco, Deak and Company could be trusted and would not maintain a record if requested; he told Chappell he had used this company on prior occasions; he told Chappell he did not know how much heroin he could get but he would do the best he could; Chappell agreed to meet him in New York; he had given Chappell the names of several people who might supply heroin and that among them was the name of his Uncle Antoine.

Defendant's only contention is that the evidence establishes as a matter of law that he was entrapped.

■ Entrapment is a positive defense, imposing on an accused the burden of showing he was induced to commit the

offense for which he is on trial. (*People* v. *Schwartz*, 109 Cal. App.2d 450, 455 [240 P.2d 1024].) Merely affording an opportunity for the commission of the offense does not constitute entrapment. ■ "Where the doing of an act is a crime, regardless of the consent of anyone, the courts are agreed that if the criminal intent originates in the mind of the accused and the offense is completed, the fact that an opportunity was furnished, or that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense." (*People* v. *Lindsey*, 91 Cal.App.2d 914, 917 [205 P.2d 1114].) ■ Where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he commits a crime does not show entrapment. (*People* v. *Benford*, 53 Cal.2d 1, 10 [345 P.2d 928].) ■ The existence or nonexistence of entrapment is a question of fact for the trier of fact. (*People* v. *Castro*, 167 Cal.App.2d 332, 337 [334 P.2d 602].)

■ " 'It is not the entrapment of a criminal upon which the law frowns, but the seduction of innocent people into a criminal career by its officers. . . .' " (*People* v. *Roberts*, 40 Cal.2d 483, 489 [254 P.2d 501].) ■ To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. (*People* v. *Benford*, 53 Cal.2d 1, 10-11 [345 P.2d 928].) The fact that government agents merely afford opportunities or facilities for the commission of the offense does not constitute entrapment. (*Id.*)

■ It is obvious from the record that the federal agents had some information that defendant was engaged in lawless activities. And it is manifest from the evidence that defendant was engaged in lawless activities because of the readiness with which he committed the offense charged and from his own testimony. The fair purport of the evidence is that Pocoroba sought the acquaintance of defendant and cultivated that acquaintanceship for several months. In the initial conversation with Pocoroba about narcotics, defendant opened the conversation with mention of a 32-carat diamond ring which could be smuggled into this country from France. The subject of narcotics was first mentioned by defendant. Pocoroba then represented himself as a retired narcotic peddler only after defendant "started the subject." Similarly, defendant was the first to mention narcotics to Chappell. The jury could reasonably infer from the evidence that defendant was not persuaded, induced, or lured but that he knowingly committed

the offense and that the idea of obtaining heroin and selling it to Chappell did not originate in the minds of the officers but in the mind of defendant. A logical inference is that defendant willingly and with preexisting criminal intent made the offer to Chappell who merely presented the opportunity. Defendant's obvious familiarity with the international narcotic trade, coupled with his professed ability to produce a substantial quantity of heroin, indicate beyond a reasonable doubt that he was not an innocent person who was induced to commit the offense by trickery, persuasion, or fraud of the federal agents. (*People* v. *Neal,* 120 Cal.App.2d 329, 333 [261 P.2d 13].) Entrapment as a matter of law is not established where there is any substantial evidence in the record from which it may be inferred that the criminal intent to commit the particular offense originated in the mind of the accused. (*People* v. *Sweeney,* 55 Cal.2d 27, 48-49 [9 Cal.Rptr. 793, 357 P.2d 1049].) We cannot say, as a matter of law, that the jury could not find that defendant was not entrapped. (*Cf. People* v. *Benford, supra,* 53 Cal.2d 1.)

Affirmed.

Shinn, P. J., concurred.

Ford, J., did not participate herein.

A petition for a rehearing was denied April 20, 1961, and appellant's petition for a hearing by the Supreme Court was denied May 16, 1961.