[Crim. No. 12447.   Second Dist., Div. Five.   Jan. 22, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. SOLOMON ARZOLA, Defendant and Appellant.

James A. Irwin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Edward J. Horowitz, Deputy Attorney General, for Plaintiff and Respondent.

STEPHENS, J.—Defendant was charged by information with violation of Health and Safety Code, section 11503 (sale or furnishing substance falsely represented to be a narcotic and delivering a non-narcotic in lieu thereof). Prior to the commencement of trial, on motion of the People and over objection of defendant, the information was amended to allege one prior felony conviction. Defendant admitted the prior, but subsequently, on motion of the defense, the prior was ordered stricken from the information. A jury trial was held and the defendant was found guilty as charged. A motion for a new trial was made and denied, and a probation report was ordered. On August 6, 1965 the criminal proceedings were adjourned, and a petition was ordered filed pursuant to Penal Code, section 6451 (now Welf. & Inst. Code, § 3051). On February 14, 1966 the defendant was sentenced to state prison for the time prescribed by law. An initial appeal was taken in this case from the denial of the motion for a new trial; that appeal was subsequently dismissed when an appeal from the judgment was taken. This appeal is from the judgment.

## Facts

On April 16, 1965, Deputy Sheriff Rodriguez was working as an undercover agent investigating possible narcotics violations. He went with a man known only to him as "Fat Louie" to a residence at 1822½ Johnston in the County of Los Angeles, and there met defendant. Defendant acknowledges that he had previously met the man known as Fat Louie, and knew his name to be Louis Dominguez. After Rodriguez and Fat Louie entered the house, Fat Louie introduced Rodriguez to the defendant. Fat Louie and the defendant then went into the kitchen, where, according to testimony of defendant, Fat Louie asked him to sell some narcotics to Rodriguez and Fat Louie stated that Rodriguez had agreed to give Fat Louie some if he could make the purchase. The defendant testified that he refused Fat Louie's request, but because of Fat Louie's insistence, decided to take them on a wild goose chase. The defendant also testified that he discussed the matter with Fat Louie out of the hearing of the deputy so as not to embarrass Fat Louie by refusing him in front of his friend. When defendant and Fat Louie returned to the living room Rodriguez offered the defendant a certain sum for a quarter of an ounce of heroin. Defendant did not refuse the offer, but agreed on a higher price after some dickering over the amount. The heroin to be delivered was represented to be of good quality.

The three then drove together to the vicinity of Brooklyn and Chicago Streets in Los Angeles, and parked. Rodriguez and Fat Louie remained in the car, while the defendant left the car, apparently to get the heroin after first obtaining some money from Rodriguez. Defendant was seen to enter and leave a couple of bars and a hotel, and to converse with another person on the street. Shortly thereafter defendant returned to the car and informed Fat Louie and Rodriguez that his supplier was "cutting up" (in narcotics jargon, preparing his inventory of heroin for resale). Defendant said it wouldn't be ready until 5 o'clock. The initial meeting of the three parties had been about 1:30 and, according to the testimony of Rodriguez, he knew that the time that defendant said would be needed before the heroin would be ready was more than necessary to complete the operation. The defendant returned the money to Rodriguez on the return to the car, and the three men drove back to the residence on Johnston Street.

There is a conflict in the testimony as to what transpired next. According to the defendant, the three parted company without making any plans on future communications and without the defendant giving the deputy the telephone number where he could be reached that day. According to Rodriguez, defendant did give him the phone number, and although the testimony on this point is equivocal, Rodriguez testified that the defendant told him to call him sometime around 3 o'clock.

Rodriguez phoned the defendant at 3:30. The defendant told him to come by the house at about 5 and to sound his horn three times. Rodriguez' testimony is that the defendant's voice sounded as if defendant were very angry at the time of the phone call. Rodriguez drove to the Johnston Street residence and sounded his horn. Defendant came out and entered the car, and he and Rodriguez returned to the area where they had been earlier in the afternoon. After parking the car, defendant obtained the same sum as had previously been agreed upon from Rodriguez, and told him to wait in the car. Defendant then went to a nearby bar and began drinking. After a 45 minute wait in the car, Rodriguez went into the bar and asked the defendant what the delay was. The defendant replied that there were narcotics investigators in the area, and he told Rodriguez to leave. About 15 minutes later, Rodriguez returned and again asked about the delay. At this time defendant became angry with Rodriguez and told him he was "ranking" the deal. Rodriguez asked for the return of his

money, and the defendant refused, saying that the supplier already had it. Defendant again told Rodriguez to go outside and wait in the car; then, aparently changing his mind, told Rodriguez to return to the Johnston Street residence. Rodriguez said he would wait in the car. About 10 minutes later Rodriguez saw the defendant leave the bar and enter another car. Rodriguez went over and again asked for his money back. At this time defendant indicated he had "the stuff." The defendant then told Rodriguez to return to the house, which was done. The defendant followed in the other car. When they arrived at the house, Rodriguez again requested that the money be returned. The defendant refused, and showed him a yellow balloon, stating it was "the stuff." The defendant was quite angry with Rodriguez at this time, and told him he never wanted to see him around the house again. They then entered the house, and the balloon containing tan powder was delivered by defendant to Rodriguez.

On analysis, the powder was found to be a non-narcotic. The evidence shows that sometime during the period in which defendant was drinking in the bar, the defendant had sent one of his friends to a nearby market to buy a balloon and a small package of powdered sugar. The sugar was placed by defendant in the balloon and later was delivered by him to Rodriguez. Defendant was arrested on April 27, 1965, in front of the Johnston Street address after the delivery of the balloon and its contents.

### Contentions on Appeal

Defendant contends: (1) that an admission was introduced into evidence that had been procured in violation of his constitutional rights; (2) that he was deprived of a fair trial because the People did not produce Fat Louie to testify; (3) that the People's case was handled in a manner calculated to prejudice the mind of the jury against the defendant and therefore deprived the defendant of a fair trial; (4) that the evidence showed entrapment as a matter of law; (5) that the instructions given on entrapment are erroneous.

### Introduction of the Admission

The contention is that the warning given by the police officer prior to defendant's making the questioned admission did not adequately warn defendant of his right to remain silent. The date of this trial being prior to the decision in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct.

1602, 10 A.L.R.3d 974] the rules enunciated in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] apply (*People* v. *Rollins*, 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221]). The evidence is that after the giving of the warning, while enroute to the police station, the defendant initiated a conversation with the officers about the charge against him. Defendant inquired if the charge was the same as a sale, and was told, basically yes. He then asked if "the stuff" was a non-narcotic, and was told that it was. He then volunteered that he didn't know about that; that as far as he was concerned it was "the stuff" (narcotic). The defendant initiated the conversation, and no question was asked of him. No process of interrogation designed to elicit incriminating statements took place. Under these circumstances, the admission was a voluntary declaration and admissible without a warning.

## Non-Production of Fat Louie

The defense contends that the prosecution's failure to produce the informer, Fat Louie, resulted in a denial of a fair trial. The testimony of Rodriguez was that he knew nothing about the informer except that his nickname was Fat Louie. The cases interpreting *People* v. *Kiihoa*, 53 Cal.2d 748 [3 Cal.Rptr. 1, 349 P.2d 673] indicate that failure to produce an informer is ground for reversal only when there has been a showing of active police connivance in the nonavailability of the witness. (*People* v. *Galvan*, 208 Cal.App.2d 443 [25 Cal. Rptr. 128].) Such is not shown here. We see no prejudice to the defendant in the instant case, since he acknowledged he was familiar with the true name of Fat Louie; had seen him on previous occasions; and knew of some of the people with whom he associated. In other words it appears that the defendant had equal knowledge of and access to the informer as did the prosecution.

## Actions of the Prosecutor

Defendant points out four examples of instances where he contends the prosecutor attempted to prejudice the minds of the jury by bringing to light the defendant's past association with narcotics, and his past criminal record. He contends that these actions by the prosecutor amounted to a denial of a fair trial.

The first alleged instance is a statement made by Rodriguez during cross-examination. Rodriguez testified that during the introduction of himself to defendant, Fat Louie

had said, " 'Don't you remember this guy was in Quad A?,' referring to being incarcerated." The defendant contends that under the doctrine of *People* v. *Ozuna*, 213 Cal.App.2d 338 [28 Cal.Rptr. 663][1], this reference to a past criminal record of the defendant calls for reversal. In *Ozuna*, the question was by the prosecutor, and there was every indication that the remark was anticipated. In our case, the question was by defense counsel, and the record suggests the statement was one anticipated, possibly in the expectation of providing this very contention. Also, in *Ozuna* the defendant did not take the stand, while in the instant case he did, thus subjecting himself to impeachment by the establishment of a past felony conviction. There is no prejudicial activity existent under the circumstances before us. We recognize that the fact of such prosecution testimony in some circumstances may dictate the defendant's decision to take the stand, for no longer could the damaging fact of a past record be excluded from jury consideration. This does not appear to be the case here.

The second alleged instance is the introduction of the admission that the defendant felt that the powder was heroin. Defendant contends that the evidence was immaterial when introduced, and that its sole purpose was to portray the defendant as one of degenerate character who was immersed in the activities of the narcotics trade. The evidence was introduced during the presentation of the People's case in chief, so was not proper at that time to rebut the defense of entrapment, which as of that time had not been raised. However, the People had the burden of proving each element of the charge alleged. The admission was relevant to establish that the defendant had promised to sell a narcotic substance.

The third alleged instance is the elicitation from the defendant on cross-examination of the fact of a prior felony conviction. The law is clear that this is a valid method of impeachment. (Evid. Code, § 788 (former Code of Civ. Proc. § 2051); Witkin, C..l. Evidence, (2d ed. 1966) § 1246, pp. 1148-1149.) Such impeachment inquiry may develop the nature of the crime, i.e., the particular felony.

The final alleged instance is the detailed inquiry made by the prosecutor into defendant's knowledge of the terms used in the narcotics underworld. We have reviewed each of the alleged examples of the prosecutor's examination into ter-

---

[1] The reference was to Rodriguez being in Quad A, but we recognize that to the jury it logically may have appeared that the defendant learned of such a fact while similarly incarcerated.

minology and find that in each instance the questions were relevant to clarify the meaning of statements made by the defendant during his examination. We see no prejudicial action in such inquiry.

## Entrapment

█ The defendant contends that the evidence shows entrapment as a matter of law. It is the theory of the defense that Rodriguez and Fat Louie harassed the defendant into making the sale; that the defendant did not want to make the sale, but simply went along with the action so as not to embarrass Fat Louie, and in the hope that Rodriguez would desist. The defendant urges that when it was established that Rodriguez was not going to desist, and persisted, the defendant became aggravated and determined to supply the non-narcotic substance. Likewise there is credible evidence that Rodriguez did in fact seek to terminate the whole activity when he unsuccessfully sought the return of his money. Even had the testimony supporting the theory of entrapment been uncontradicted, entrapment would not have been shown as a matter of law. (*People* v. *Benford,* 53 Cal.2d 1, 5 [345 P.2d 928].) In the instant case there was testimony which strongly indicates that the defendant was not so reluctant as he would have us believe. The conversation in the kitchen with Fat Louie is, of course, uncorroborated. However, the testimony is undisputed that when Rodriguez offered to buy the narcotic from the defendant at the time the defendant and Fat Louie returned from the kitchen, Rodriguez was met with a counter-offer, and not a refusal to sell. The defendant went voluntarily to the initial contact with the supplier and accepted the money from Rodriguez. There is evidence that defendant encouraged Rodriguez to phone him back. There is testimony that the delay while defendant was at the bar was because narcotics officers were in the area, and not because he did not wish to sell. Lastly, we have the three separate occasions when Rodriguez asked that his money be returned and the deal called off, and each time the defendant refused. Entrapment was not shown as a matter of law.

Though we conclude that entrapment is not here shown as a matter of law, it was raised as a defense, and defendant is entitled to accurate instruction to the jury.

█ Section 11503 involves two elements: (1) that the defendant agree . . . to unlawfully sell . . . any narcotic; and (2) deliver . . . any other substance in lieu thereof. (*People* v. *Lewis* (1962) 206 Cal.App.2d 82 [23 Cal.Rptr.

495]:) Without the second element of delivery . . ., there is no violation of this section. (*People* v. *Brown* (1960) 55 Cal. 2d 64 [9 Cal.Rptr. 816, 357 P.2d 1072].)

As may readily be seen, element (2) could not be conceived and suggested by an officer or his agent who made himself available as the purchaser of a narcotic. This element must be conceived by the seller. The acts and conduct resulting in entrapment then *must* in the case before us relate solely to element (1) to constitute such a defense to this section.

The defense of entrapment in this case, being related only to the first element within the crime, we consider whether the instructions as given were adequate and accurate. When considering "instructions given," we include the statement of the trial judge to the jury in answer to the question posed by the jury, as well as the prepared instructions on the subject of "entrapment."[2]

The record shows that after the jury had been instructed as to all the law applicable to the case and commenced deliberation, they were returned to the courtroom at their request. The following colloquy took place (after the court noted all counsel, the defendant, and jurors to be present):

"The Court: Ladies and gentlemen, do I understand correctly from the Deputy Sheriff that there is some confusion

---

[2]CALJIC 851 (Rev.): "The law does not tolerate one person, particularly a law enforcement officer, generating in the mind of another person who is innocent of any criminal purpose, the original intent to commit a crime thus inducing such person to commit a crime which he would not have committed or even contemplated but for such inducement. [¶] If the intent to commit the crime did not originate with the defendant and he was not carrying out his own criminal purpose, but the crime was suggested by another person for the purpose of entrapping and causing the arrest of the defendant, then the defendant is not criminally liable for the acts so committed."

CALJIC 854 (Rev.): "In considering the defense of entrapment the important question for you to determine is this: Did the defendant conceive the idea of committing the crime himself or was the idea conceived by another and suggested to the defendant for the purpose of inducing him to commit the crime in order to entrap him and cause his arrest?"

CALJIC 852 (Rev.): "When law-enforcement officers are informed that a person intends to commit a crime, the law permits the officers to afford opportunity for the commission of the offense, and to lend the apparent cooperation of themselves or of a third person for the purpose of detecting the offender. When officers do this, if the suspect himself, originally and independently of the officers, intends to commit the acts constituting a crime, and if he does acts necessary to constitute the crime he is guilty of the crime committed. He has no defense in the fact that an officer or other person engaged in detecting crime was present and provided the opportunity, or aided or encouraged the commission of the offense."

These written instructions went to the jury room for jury perusal.

in your mind concerning the instruction having to do with the subject of or defense called entrapment?

"The Foreman: Yes, sir.

"The Court: That although you have read the instructions that have been given to you earlier, they have been submitted to you, there is still some doubt in your mind as to just the state of the law on this subject entrapment, do I understand correctly? Let me see if I can assist you further on that subject and to explain perhaps just a little bit more in detail the law on the subject of entrapment, which is a defense to this crime if you believe it to have been in fact accomplished."

Thereafter followed a statement by the court following generally the CALJIC instructions heretofore footnoted. Then the judge concluded his statement of explanation, as follows: "In this case we have this peculiar instance where the original plan either in the mind of the defendant or the mind of the officer, whichever one you feel whichever place it originated according to your findings, was for the sale of a narcotic but in lieu thereof it appears to be agreed by all the parties there was a substitute in lieu of the planned narcotic. *Nevertheless, an offense would have been committed if the idea for this was in the mind of the defendant, whereas if it originated in the mind of the officer and he was the one that persuaded, induced, or talked the defendant into doing it, then this would have been an entrapment, even though the offense would have been committed.* [Italics added.]

"Now, does that assist you?" Unfortunately, in the judge's effort to be careful, he made the second factor of the crime a two-way street, when in fact it cannot be such under our facts. By indorsing the second factor, i.e., intent to and delivery of a non-narcotic, as possibly emanating anywhere but in the mind of defendant, the "offense would [NOT] have been committed," for there would not have been an *agreement to sell a narcotic,* but only an *agreement to sell a non-narcotic and the delivery of a non-narcotic.* Such a completed agreement is not a crime. It is also possible under the judge's statement of explanation for the jury to conclude that the idea for the delivery of the non-narcotic had to come from the officer (or informer) and without such showing, the defense of entrapment would not have been made out.

There was one other comment which could well have prejudiced the defendant's theory of entrapment. As we have above noted, and as CALJIC 851 (Rev.) makes clear, the law does not tolerate any person generating the original intent to commit a crime which would otherwise not have been com-

mitted, for the purpose of entrapping and causing the arrest of the defendant. Of course, such action on the part of police officers would be particularly heinous. By the court's answer in response to the jury's question, "If a man is a known police informer or informing in the case, is he technically known as an employee of the Police Department?" the jury could well have understood that the court limited the jury's consideration of entrapment to that action of the police officer. The court stated: "It is a difficult question to answer categorically yes or no, and I don't think it should necessarily be controlling in this case at all, I think you can decide it without that question being answered." One reasonable construction of this statement is that it didn't matter if Fat Louie did the entrapping, in that his acts could be disregarded when considering this question. Of course, this is not the law. (*Sherman* v. *United States* (1958) 356 U.S. 369, 372 [2 L.Ed. 2d 848, 851, 78 S.Ct. 819].) This response is also susceptible to the construction that it didn't matter if Fat Louie and the officer were working together on this case, the entrapment by either was likewise an entrapment by the other. No doubt the court so intended his statement to be understood, but since, reasonably, the very antithesis could be the jury's conclusion, as we above noted, the prejudice to defendant must be recognized.

The Attorney General argues that the remarks of the trial judge to which we have referred are not prejudicial even if they are ambiguous and confusing. We cannot agree. The trial judge sought to clarify a CALJIC instruction on entrapment. The result was that he instructed erroneously. It was like clearing the water in a pond by stirring the silt in its bottom. It prejudiced the defendant by making unclear, ambiguous and erroneous that which, though not clear to the jury, had none of the latter two disabilities.

We conclude that the instructions as a whole constitute an inaccurate instruction on the law, and the defendant was prejudiced thereby to such extent that a reversal is necessary.

The judgment is reversed.

Kaus, P. J., and Hufstedler, J., concurred.