[Crim. No. 6501. First Dist., Div. Two. Aug. 19, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. BENJAMIN GRAYS, Defendant and Appellant.

Edwin T. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward P. O'Brien and Horace Wheatley, Deputy Attorneys General, for Plaintiff and Respondent.

SHOEMAKER, P. J.—Defendants Benjamin Grays and Alfred Smith, Jr., were jointly charged by indictment with two counts of selling heroin, in violation of section 11501 of the Health and Safety Code. Defendant Smith subsequently entered a plea of guilty, and the case proceeded to trial against defendant Grays only. After a trial by jury, he was acquitted of the first count and convicted of the second. He appeals from the judgment of conviction.

The evidence bearing upon the offense charged in the second count of the indictment may be summarized as follows: Sometime between 8 and 9 p.m. on August 11, 1966, Walker, a state narcotic agent, met with Fish, an informant, at the office of the narcotic bureau in San Francisco. Fish placed a telephone call to Alfred Smith at 870 Grove Street, and Walker, with Fish's consent, recorded the call and listened in. Walker heard Fish inform Smith that he wanted a "whole one," a term which in narcotics parlance means a full ounce of heroin. Fish and Smith agreed upon a price of $350.

Fish was then searched by Noel, another narcotic agent, and was found to be in possession of no narcotics. Fish was equipped with a radio transmitter, and was then driven by Walker and Narcotic Agent Ohlson to the intersection of Eddy and Buchanan Streets. Noel, in the meantime, drove to the apartment building located at 870 Grove Street and parked outside. He saw Smith and defendant Grays emerge from the building and get into a white Ford Thunderbird. Noel followed the car, which proceeded to Gilmore's Barbecue on Fillmore Street. Defendant, who had been occupying the passenger seat, then got out of the car and entered the barbecue.

In the meantime, Agents Walker and Ohlson had arrived at Eddy and Buchanan Streets and had furnished Fish with $350 in state funds. The serial numbers of the bills had all previously been recorded by the narcotic bureau. Fish then got out of the car and stood in a parking lot located at the intersection.

Walker and Ohlson remained nearby and saw a white Thunderbird drive up. Fish got into the Thunderbird, and the two agents, who had a radio receiver in their car, heard Fish ask the driver of the Thunderbird what had taken him so long. A male voice, which Walker recognized as Smith's, replied that he had taken a friend to get some food. The Thunderbird then proceeded to the corner of Fillmore and Eddy Streets, and the agents, who had followed in their car, heard Fish counting out money. Fish asked Smith why he had

stopped the car, and the latter replied that he was going to pick up his friend who was in getting some food. Fish then stated that he thought it was a hot part of town and that they could be doing business elsewhere. At this point, Smith left the car, walked to Gilmore's Barbecue and entered.

Agents Walker and Ohlson had meanwhile driven past the Thunderbird, made a U-turn and parked on Fillmore Street opposite Gilmore's Barbecue. They saw defendant Grays looking out the window of the restaurant and then saw Smith enter and confer briefly with defendant. Smith then left the restaurant and walked back to Fish, and the agents heard him say that ''this guy'' didn't want to come out to the car; that he and Fish should go into the restaurant because he and his friend were concerned about a vehicle which had been parked near their house when they left it earlier that evening. Although Fish indicated that he would rather do business at another location, he ultimately agreed to enter the restaurant.

Agents Walker and Ohlson then observed Smith and Fish enter the restaurant, where they joined defendant and sat down in a booth. The agents heard Smith inquire whether there was a restroom. Fish replied that there was, and he and defendant then walked toward the rear of the restaurant and disappeared from the agents' view. The agents then heard a voice which Walker subsequently identified as defendant's state, ''Here. I guess you know what you are doing. There is an awful lot of heat here.'' Fish and defendant then returned to the front of the restaurant, and Fish proceeded on out the door. He walked up Fillmore Street some distance and then took off his hat as a prearranged signal that he had made a purchase of narcotics. Agent Noel immediately approached Fish, and the latter handed him four balloons. Noel then searched Fish and found no currency in his possession. The contents of the four balloons were subsequently analyzed by a chemist. Three of the balloons were found to contain heroin, and the fourth was found to contain milk sugar. The quantity of heroin in the three balloons was slightly over one-half ounce.

Smith and defendant had left Gilmore's Barbecue shortly after Fish and had driven off in the Thunderbird. Agents Walker and Ohlson followed in their car until the Thunderbird came to a halt at a stoplight. The two agents then left their car and arrested Smith and defendant. Defendant was searched, and $350 was found in his pants pocket. The numbers on all the bills corresponded with those previously

recorded by the narcotic bureau. Walker denied that defendant made any statement at the time of his arrest. Ohlson likewise denied that Smith made any statement to the effect that he had given the $350 to defendant.

Defendant, testifying in his own behalf, stated that he lived in Fresno and had come to San Francisco on August 8 or 9, 1966, for the purpose of buying some clothes. He admitted that he knew Smith and had been with him on August 11, 1966, but denied having any knowledge of a sale of heroin. He admitted having been inside the apartment building at 870 Grove Street and further admitted that Smith had driven him to Gilmore's Barbecue on August 11, 1966. According to defendant, Smith subsequently returned to the restaurant, unaccompanied by anyone else, and sat next to defendant at the counter. Defendant did not know anyone else in the restaurant and did not speak to anyone other than Smith. He did not know Fish and did not see him at any time on August 11. He did not go to the rear of Gilmore's Barbecue at any time. Defendant explained his possession of the $350 in state funds by stating that immediately prior to his arrest, Smith had handed him the money and stated, "Hold this for me." Defendant asked no questions and put the money in his pocket. According to defendant, Smith later made the statement, in the presence of one of the narcotic agents, that he had given the money to defendant. Defendant believed that this statement was made after he and Smith had been taken to the narcotic bureau and at a time when Smith was being questioned in a room adjacent to that in which defendant was being held. Defendant was unable to say which of the narcotic agents was with him at the time or which of the agents was questioning Smith.

Ohlson testified in rebuttal that defendant and Smith were taken to the narcotic bureau immediately after their arrest and were placed in separate rooms in order that each might be questioned outside the hearing of the other. The rooms were not connected and the doors leading from each of the rooms into the hall were closed. Ohlson had talked with Smith about the events resulting in his arrest, and Smith had at no time stated that he had given the $350 to defendant.

 Defendant Grays first contends that the evidence is insufficient to support his conviction because he was not shown to have been a party to the agreement between Smith and Fish, whereby the former was to sell heroin to the latter. Defendant takes the position that his only connection with the

illegal sale transacted by Smith and Fish was that he was an "unaware dupe" who happened to be present at Gilmore's Barbecue at a time when Smith was completing the sale to Fish. Defendant, in his brief, accepts the fact (contrary to his sworn testimony) that after Smith and Fish entered Gilmore's Barbecue, he (the defendant) was seen to accompany Fish to the rear of the restaurant and was thereafter heard to say, "Here. I guess you know what you are doing. There is an awful lot of heat here." Defendant also concedes that it was he who had possession of the $350 in state funds at the time of the arrest. However, defendant denies that this evidence made up for an alleged gap in the surveillance by the narcotic agents. Thus defendant reasons that Smith could easily have supplied Fish with the heroin while they were seated at the booth in Gilmore's Barbecue and that defendant's remarks from the rear of the restaurant could have been made while he was observing Fish in the act of taking an oral dose of the heroin received from Smith. Defendant likewise reasons that his possession of the $350 in state funds is entirely consistent with his innocence, since his testimony that Smith gave him the funds immediately prior to his arrest is supported by Walker's testimony that Fish counted out the money before he and Smith entered Gilmore's Barbecue and, according to defendant, presumably gave the money to Smith at that time. Defendant thus contends that the instant case is one in which the surveillance was not sufficiently continuous to exclude the possibility that the sale was effected by Smith alone. He also asserts that he could not properly be held guilty as an aider or abettor of the illegal sale because he was not shown to possess the requisite guilty knowledge.

The basic difficulty with defendant's position is that he views the evidence in the light most favorable to his position and has overlooked the well-established rule that an appellate court must assume in support of the judgment the existence of every fact which the jury could reasonably deduce from the evidence. (*People* v. *Alonzo* (1958) 158 Cal. App.2d 45, 47 [322 P.2d 42].)

Although possession of marked money is insufficient, in itself, to prove that a defendant made an illegal sale of narcotics (*People* v. *Mateo* (1959) 171 Cal.App.2d 850, 855 [341 P.2d 768]), the evidence in support of defendant's conviction is clearly not confined to his possession of the $350 in state funds. The evidence likewise does not bring it within the purview of those cases, upon which defendant relies, which have

required proof that the purchaser of the narcotics lacked the opportunity to contact anyone other than defendant at the time of the alleged sale. (See opinion of this division in the case of *People* v. *Castedy* (1961) 194 Cal.App.2d 763, 766 [15 Cal.Rptr. 413].)

Although defendant argues that Smith could have given the heroin to Fish while they were seated in the booth at Gilmore's Barbecue, agents Walker and Ohlson were maintaining radio contact with Fish at the time and heard no remark indicative of such an occurrence. On the other hand, the agents did hear defendant remark, ''Here,'' and comment upon the ''heat'' after he and Fish had gone to the back of the restaurant. The agents did not hear Fish speak to any person other than Smith or defendant at any time and similarly did not see him come into contact with anyone but them. This evidence, coupled with defendant's possession of the state funds, would certainly support the jury's implied finding that the heroin was transferred by defendant to Fish while the two men were in the rear of Gilmore's Barbecue. Under such circumstances, defendant was guilty as a principal, for knowingly aiding and abetting in the sale of heroin even if the money had in fact been previously given to Smith.

Defendant next contends that he was deprived of a fair trial because the prosecution failed to produce the informant, Fish, as a witness. Defendant contends that Fish was an active participant in the sale and that the People's case was legally insufficient in the absence of his testimony. Defendant also asserts that Fish's testimony might have served to exonerate him. He concedes that Walker denied, during *voir dire* examination, that he had any knowledge of Fish's whereabouts at the time of trial, but asserts that if the prosecution was unable to produce the witness, the trial court ought to have instructed the jury, on its own motion, to return a verdict of acquittal or, at the very least, that unless the absence of the witness was sufficiently explained, it should be inferred that his testimony would have been unfavorable to the prosecution.

Defendant's contention relative to the insufficiency of the People's case, in the absence of Fish's testimony, has been discussed above and determined to be untenable. It follows that an instruction to acquit would have been improper.

It is also settled that the prosecution's failure to produce an informant is a ground for reversal only if there is a showing of active police connivance in the nonavailability of

the witness. (*People* v. *Arzola* (1968) 258 Cal.App.2d 124, 130 [65 Cal.Rptr. 372]; *People* v. *White* (1966) 239 Cal. App.2d 355, 357-358 [48 Cal.Rptr. 756]; *People* v. *Brooks* (1965) 234 Cal.App.2d 662, 678 [44 Cal.Rptr. 661].)　In the instant case, no such showing was made. Moreover, defendant made no objection to the informant's absence, made no attempt to call him as a witness, and did not seek a continuance in order to locate him.

Defendant's suggestion that the jury should have been instructed to infer that Fish's testimony would have been unfavorable to the prosecution is based upon *Washington* v. *United States* (D.C. 1958) 258 F.2d 696 [103 App.D.C. 396], and *People* v. *Castedy, supra,* at page 770. In the *Washington* case, the court merely held that no claim of error could be predicated upon the government's failure to produce an informant at the trial where there was evidence that the prosecution had made reasonable efforts to locate the absent witness and the jury had been instructed that it might draw the inference that the testimony of that witness would be unfavorable to the government unless the witness' absence was sufficiently explained. In *Castedy,* the court referred to the holding in the *Washington* case with apparent approval.

Neither of these cases holds that the trial court is required, on its own motion, to instruct the jury relative to the inference which may be drawn from an informant's failure to testify.　The instant case falls within the general rule that a trial court has a duty to give instructions only on the general principles of law governing the case, but need not instruct on specific points developed at the trial unless requested. (*People* v. *Jones* (1964) 225 Cal.App.2d 434, 437 [37 Cal.Rptr. 406].)　Since defendant did not request the instruction in question, he is precluded from claiming that its omission was error.

Defendant's third and final contention is that the public defender's representation of both Smith and defendant caused a conflict of interest which denied defendant the undivided loyalty of his counsel and thereby deprived him of a fair trial.

Defendant points out that McNamara, assistant public defender, represented both Smith and defendant at their arraignment on January 20, 1967. According to a certified copy of a document appended to defendant's brief, Smith pleaded guilty to the third count of the indictment on November 25, 1966, at which time he was represented by another member of

the public defender's office. Smith was subsequently committed to the California Rehabilitation Center, under section 3051 of the Welfare and Institutions Code, but remained subject to the imposition of a sentence in the future.

Defendant, who continued to be represented by McNamara, entered a plea of not guilty on January 24, 1967, and his trial commenced on March 20, 1967. During the course of the trial and allegedly upon the insistence of defendant, his counsel called Smith as a witness for the defense. After the witness had admitted having been a codefendant in the case and having been committed to the California Rehabilitation Center, defense counsel stated that he had concluded, as a result of having interviewed Smith, that the court ought to advise the witness of his constitutional rights. The court then advised the witness of the privilege against self-incrimination. Smith invoked the privilege and declined to testify.

Defendant's claim of divided loyalty on the part of his trial counsel is based solely upon the fact that he asked the court to advise Smith of his constitutional rights and, during the discussion immediately following, made the remark that he did not wish to violate Smith's confidence and wanted to be sure that he was fully aware of his rights and was acting on his own volition. Defendant contends that this conduct on the part of his counsel demonstrates that he was attempting to protect Smith, whom he had previously represented, at the expense of defendant. Under such circumstances, defendant asserts that the trial court was under a duty to intervene, even in the absence of any request by defendant, and see to it that he was furnished with another attorney who was capable of giving his full loyalty to his client.

*People* v. *Welch* (1963) 212 Cal.App.2d 397, 400-401 [28 Cal.Rptr. 112], upon which defendant relies, is authority for the rule that the trial court is under no duty to ascertain whether or not a conflict of interest might arise between codefendants for whom the same counsel has been appointed and that any such conflict should be brought to the court's attention by objection raised by defendants or counsel.　In the instant case, McNamara represented both Smith and defendant at their arraignment; however, Smith entered a plea of guilty, while represented by another member of the public defender's office, before defendant's case ever went to trial. Thus, at the time defendant's trial commenced, it was not reasonably foreseeable that McNamara's prior representation of Smith would in any way detract from his loyalty to de-

fendant. Any possibility of a conflict in interest could not have become apparent to the court until such time as McNamara called Smith as a witness and indicated that he felt it proper that the court instruct the witness as to his constitutional rights. The record discloses that McNamara, at all stages of the trial, conducted an able and vigorous defense for the defendant.

Research discloses no prior decision dealing with the precise situation here present. It is doubtless true that all possibility of prejudice to defendant could have been obviated had McNamara resigned as defendant's attorney when he became aware of defendant's desire to call Smith as a witness. However, the record does not indicate when the decision to call Smith was made and, in any event, McNamara did not choose to withdraw from the case.

Under such circumstances, the question squarely presented is whether the trial court, which had no reason to anticipate any conflict of interest until Smith was called as a witness, should at that stage in the proceedings have taken the action suggested by defendant and appointed another attorney to represent him. This question must be answered in the negative for two reasons. First, defendant became aware of his counsel's feeling that the witness should be advised of his constitutional rights at the same time as the trial court and did not object nor bring his present position on the matter to the court's attention in any way. Second, the appointment of a new defense attorney at this stage in the proceedings obviously would have had no effect on Smith's decision to avail himself of his right not to testify. Since defendant does not suggest that the appointment of new counsel would have benefited him in any other way, we are satisfied that the trial court was under no duty to make such an appointment even had defendant requested it.

Judgment affirmed.

Agee, J., and Taylor, J., concurred.

A petition for a rehearing was denied September 18, 1968, and appellant's petition for a hearing by the Supreme Court was denied October 30, 1968.