Filed 6/27/13  P. v. Villapando CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VENSON VILLAPANDO,<br><br>    Defendant and Appellant. | G046110<br><br>(Super. Ct. No. 10WF0127)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on June 10, 2013, be modified as follows:

1.  On page 12, at the end of the first full paragraph, within the citation string, delete the following:  "; see *People v. Benford* (1959) 53 Cal.2d 1, 10 [the application of the entrapment defense depends upon whether 'the intent to commit the crime originated in the mind of defendant or in the mind of the entrapping officer']."

2.  On page 15, in the second full paragraph beginning "The circumstances, described *ante*," delete the second sentence which begins "The record supports the finding" in its entirety.

These modifications do not effect a change in judgment. The petition for rehearing is DENIED.

FYBEL, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.

Filed 6/10/13  P. v. Villapando CA4/3 (unmodifed version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046110 |
| v. | (Super. Ct. No. 10WF0127) |
| VENSON VILLAPANDO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Reversed.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Meagan J. Beale and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

# INTRODUCTION

Defendant Venson Villapando appeals from the judgment entered after a jury found him guilty of one count each of attempting to commit a lewd and lascivious act upon a child under the age of 14 years and of attempting contact with a minor with the intent to commit a lewd act upon the minor. Villapando argues the trial court erred by failing to instruct the jury, sua sponte, on the defense of entrapment. He also argues the prosecution wrongfully failed to disclose exculpatory evidence, in violation of Penal Code section 1054.1 and *Brady v. Maryland* (1963) 373 U.S. 83. (All further statutory references are to the Penal Code.)

We reverse. For the reasons we will explain, there was substantial evidence of entrapment admitted at trial. Therefore, the trial court erred by failing to give an instruction on entrapment to the jury, notwithstanding Villapando's trial counsel's failure to request such an instruction. The court's error was not harmless because a more favorable result for Villapando was reasonably probable had an entrapment instruction been provided. The jury, as the trier of fact, should have received the entrapment instruction and reached its verdict with that instruction in mind. Because we reverse for a new trial on this ground, we need not reach Villapando's other contention of error.

# FACTS

## I.

### SUMMARY OF THE PROSECUTION'S EVIDENCE

On July 9, 2009, Detective Alan Caouette of the Huntington Beach Police Department, who was assigned to the special investigations bureau responsible for prostitution, pimping, and pandering cases, posted an advertisement on an online Internet-based advertisement board known as Craigslist. Caouette's advertisement was posted in the "casual encounters" section of the Craigslist Web site (the advertisement)

2

and bore the heading, "looking to get by in hard time – w4m (hb)." Caouette testified that based on his training and experience, the term "w4m" referred to "women for men" in the "world of prostitution." He testified "hb" stood for the City of Huntington Beach. The body of the advertisement read: "looking to have a good time are u :)."

Caouette received over 100 responses to the advertisement, including one from Villapando on July 9, 2009 at 6:29 p.m., in which he stated, "hey i want to have fun... what do you have in mind... anything is possible." Within a minute, Caouette responded to Villapando, stating, "im only 13 and need a $100 so if still interested let me know, jess."[1]

We set forth below the e-mail communications exchanged between Villapando and Caouette, and the text messages exchanged between Villapando and Detective Brian Smith, who took over communicating with Villapando later in the investigation; both Caouette and Smith used the undercover identity of "Jess" in these communications. All grammatical and spelling errors were contained in the original messages.[2]

A.

*July 9, 2009 E-mail Messages Between Villapando and Caouette*

From 6:44 p.m. to 8:04 p.m. on July 9, 2009, Villapando and Caouette exchanged the following e-mail messages. Villapando: "send me a pic and a number... why do you need $100?" Caouette: "cuz i wanta buy something,, i only have text minutes I need to pay my bill... ." Villapando: "what are going to do for me? to earn that $100." Caouette: "what u want,, ill do most anything." Villapando: "where you located at? where do you want to meet? r u trying to set me up? for my safety."

---

[1] Caouette testified that he established the undercover identity on the Internet of a 13-year-old female named Jessie Browne, for the purpose of investigating cases such as this one.

[2] Caouette testified that he used language that a 13 year old would use, including misspelled words and abbreviations.

Caouette: "well seeing im 13 i cant drive so i would need to be picked up,, by my house is cool i can go whereever,,, and NO im not setting u up ,, ." Villapando: "where do you live? r u down to fck?" Caouette: "sure are u down to give me a 100 bucks ,, and can u pickme up i cant drive." Villapando: "im sure...i promise, im a man of my word." Caouette: "ok i can do it i guess, but we need a condom cuz i cant get into trouble,, whats the plan ,, do i need to walk to u." Villapando: "well tell me where you want to meet and i will pick you up... just go up to me, i will get out of my car and i will where my key chain around my neck ITS BLACK WITH LAKERS LOGO AND I WILL BE WEARING A BLACK ANGELS HAT WITH WHITE NIKE SHOES, go up to me and say hi... will take it from there.... but you need to tell me where to meet." Caouette: "ok,, what do i call u ,, and what should i wear and can i shower first ,, and where we going." Villapando: "just say 'hey dude do you have a cigaratte' where what ever you want... i was think we should get a hotel room and chill for like an hour... im only 22!!![3] tell me where to meet you so when your done showering im already there." Caouette: "hotel room, wow ,, maybe i can shower there if u want.. ." Villapando: "yeah we can shower together... so where do you want me to pick you up?" Caouette: "where do u live so i can give ur directions." Villapando: "fullerton." Caouette: "shit my mom just cam home,,gota go ill be back." Villapando: "ok well im going to play basketball, for like an hour... if you want to do it tonight im still down or tomorrow afternoon... shoot me an email."

B.

*July 10, 11, 14, and 25, 2009 E-mail Messages
Exchanged Between Villapando and Caouette*

At 9:20 p.m. on July 10, 2009, Caouette reestablished contact with Villapando by sending the following e-mail: "eyyyyyyyyyyyyyyyyy,,hiiiiiiiiiii hows was

---

[3] Villapando was 25 years old at the time.

the game."  From 9:28 p.m. until 10:13 p.m., they exchanged the following e-mail messages.  Villapando:  "It was cool I played til 1030... So what's up?"  Caouette:  "Nodda."  Villapando:  "If you still want to hang out...  Tell me where to meet you at."  Caouette:  "im not wanting to hang out in need to make some money,, silli."  Villapando:  "Well make that money then...  You have to let me know now where to meet."  Caouette:  "yes later ok."  Villapando:  "Well I got stuff to do today...  But hit me up n we'll see!  Right now would be the best time."

On July 11, Caouette received three e-mail messages from Villapando.  At 7:13 a.m., Villapando's e-mail stated:  "so when are we going to meet up?"  At 3:28 p.m., Villapando wrote:  "hey wats up?  im really bored....."  At 11:33 p.m., Villapando wrote:  "Hey I'm off work today!  Just hitting u up to see if u want tmake some money?  I have $150 that can be urs...  Hit me up."  Caouette did not respond to Villapando that day.

On July 14, Caouette sent an e-mail message to Villapando, stating:  "ILL BE BACK ON THURS HAD TO GO OUT OF TOWN WITH GRANDMA.  JESS."

On July 25, Villapando's e-mail stated:  "Hey hey wats up?"

C.

*August and September 2009 E-mail Messages*
*Exchanged Between Villapando and Caouette*

On August 4, 2009 at 8:08 p.m., Villapando wrote:  "Hey let me know if you still want to make money."  On August 7, Caouette wrote, "sure where do u live" and also wrote, "notta."  On August 8, Villapando wrote, "i live in fullerton... where do you live at?"

From August 12 through 26, Villapando and Caouette engaged in the following e-mail exchanges.  Caouette:  "Hb,, did i tell u i was 13 years old,, are u cool with that.. and what do you have in mind."  Villapando:  "lets meet up and i will tell you.... r u down for tonight?"  Caouette:  "maybe but i dont like suprises im a straight shooter,, i like to know what is expected.. sooo.. ."  Villapando:  "i want to do it with you,

5

you know what i mean.... when can you do it? be straight up." Caouette: "like sex u mean,,, iil do almost anything." Villapando: "Yeah, so when can you do it?" Caouette: "how old r u ,, i think im free thurs or fri." Villapando: im 21... lets do it on friday around noon. where do you want to meet?" Caouette: "how bout thurs at 2 ish." Villapando: "I can't do it on thur at 2, I get off work at 4. I can do it on friday after 11am or thurs after 4 pm."

From September 1 through 29, Caouette and Villapando exchanged the following e-mail messages. Caouette: "hiiiiiiiiiiiiiiiiiiiiiii." Villapando: "Hey hey!" Caouette: "so do u have face book,, and can u meet later. do u still want me." Villapando: "I don't have a face book but I do have myspace. Look me up it's an old one but search me under v[]@yahoo.com,,, I still want to meet but I work 11am-8pm now! So just let me know when ur available." Caouette: "ok whats ur name any way." Villapando: "Vince! Hey can u send me more pics of u?" Caouette: "i think i found your my space thats a nice car, that the one u picking me up in,, hubbaaaaa." After Villapando had not responded for four days, Caouette wrote: "Where u go." At some unspecified point in time, Caouette e-mailed to Villapando a photograph that he had obtained after using the Google search engine to find a picture of a 13-year-old female.

On September 8, Villapando responded: "So you going to send me more pics? When do you want to meet, I want to see you." Caouette: "i might be able to get out tomorow nite . to much to do tonite? BTW nice car on myspace =)~ is it urs." Villapando: "Yup that's my car! Well I get off at 8 tomorrow so just let me know." Caouette: "can we hhok up friday,, or something busy day at school.. im tired xoxox." Villapando: "hey wats up? how is school going? i have been thinking about you...lol." Caouette: "me 2,, when we meeting maybe thurs ?" Villapando: "Sure around what time?"

D.

*October 2009 E-mail Messages Exchanged Between Villapando and Caouette*

From October 1 through 20, 2009, Villapando and Caouette exchanged the following e-mail messages. Caouette: "im at school,,,, may go to a football game soo ill email u k." Villapando: "ok." Six days later, Caouette wrote: "hiiiiiiiiiiiiii how are u." Villapando: "im good just chillen... wats up with you? hey send me more of your pics and i will send you some of mine if you like." Caouette: "ok ill get a few,, so when do u wanta meet,, ." Villapando: "when ever you can... Soon i hope." Five days later, Villapando wrote: "hey wats up?" Caouette: "nodda u how bout friday :) afternoon ish." Villapando: "i wish i could but weekends would work best for me cuz i work nights on the weekdays... so let me know if you can do it on the weekend or weekdays after 8pm." Caouette: "yeah after 8 is fine with me,, we have the same deal right,,,,,,u said 100 for sex.. and since i cant drive yet at 13 ,, u gonna pick me up..........and where will we go i think my mom will be home,, :) xoxoxxo." Villapando: "well tell me a spot where i can pick u up... We'll figure it out from there." Caouette: "coolll sounds fun lets meet this week :)." Villapando: "just let me know when and where."

E.

*November and December 2009 E-mail Messages*
*Exchanged Between Villapando and Caouette*

On November 12, 2009, Villapando wrote: "Hey whats up?" Caouette responded on November 17, stating: "yo been real busy sorry,, how are u doing,, whats new." On November 22, Villapando wrote: "hey wats up? Well let me know if you want to hang out, i get off work at 2pm now."

On December 10, Caouette wrote: "cool how bout next week,, ." Villapando responded on December 14: "Yea I down for that, just let me know when. Hope to hear from you soon." On December 21, Villapando and Caouette had the following e-mail exchange. Caouette: "hi whats new, how r u im on break from school,

7

so u wanta hook up this week or what. what do u want to do, im trying to earn some $."
Villapando: "Yea fo sho... You already know what I want to do! Let me know when you want to do this I'm free after 2pm...$$$."

On December 22, Villapando and Caouette exchanged the following e-mail messages. Caouette: "was it a hand job for $100 or what did we negotiate i forgot. remember im only 13 so u will have to pick me up is that cool, give me ur number and ill text u later, k,, anytime after 3 is cool. jess." Villapando: "No that wasn't it... Shoot me a text 714[]." Caouette: "first tell me what u want so i know what im in for ahhaha,,, i wanta make sure ill do it, u know :)." Villapando: "S e x ! :)."

F.

*On December 22, 2009, Smith, Assuming the Identity of Jess, and Villapando Exchange Text Messages and Set Up a Meeting at a Fast Food Restaurant; Villapando Arrives at the Restaurant and Is Arrested.*

Between 3:01 p.m. and 3:56 p.m. on December 22, 2009, Villapando and Smith, who took over communicating with Villapando in the investigation and assuming the identity of Jess, exchanged the following text messages and set up a meeting for that afternoon. Smith: "whats up... its jessie :)." Villapando: "Hey." Smith: "whatcha doing." Villapando: "Just got off work... Relaxin! U?" Smith: "being lazy." Villapando: "Haha...So where do you stay at?" Smith: "my moms house in hb." Villapando: "Cool! So r u still down to meet?" Smith: "yeah as long as u can pick me up...where u want to go." Villapando: "Ummm dunno... I can pick u up n we can get a hotel." Smith: "okay I guess ill tell my mom im heading out to eat or something so il be good for a lil bit." Villapando: "Ok where should I pick u up... It will probably take me an hour to get there cuz of traffic." Smith: "okay... ill get cleaned up... ." Villapando: "Well let me knwwhere to pick u up." Smith: "okay...um theres a carls jr around the corner ...I hang out there." Villapando: "Wats the cross street." Smith: "beach and yorktown." Villapando: "Ok... Hey ur not a cop r u?lol kind of scared." Smith:

8

"nope." Villapando: "I hope so." Smith: ":) just." Villapando: "U wanna meet there around 4:45." Smith: "sure ...just promise me ur a nice guy and ull wear a condom." Villapando: "No worries, I won't force you to do anything u don't want." Smith: "thanks... its actually been a while since ive done anything lol ur not gonna stick it in my butt or anything right lol." Villapando: "Haha do u want me to... Lol." Smith: "during the summer... ." Villapando: "When is the last time u had sex." Villapando: "Have u done this before?" Smith: "u mean sex for money? Or sumthing else." Villapando: "Yea." Smith: "only once...but it was a guy I knew." Villapando: "Ok, I've never done it." Smith: "so is 100 okay with u." Villapando: "yea." Smith: "okay :)" and "hey im gonna hop in the shower real quick so don't text me pleeeease."

At 4:16 p.m., Smith sent a text message to Villapando, stating, "okay im out." Villapando responded, "I'm on my way, I'll let u knw when I'm close." Villapando and Smith exchanged the following text messages. Smith: "okay...is it cold outside." Villapando: "Yup it's 56 degress." Smith: "brrr hope u have a warm car lol." Villapando: "Lol." Smith: "turn up ur heater." Villapando: "K." Smith: "ill just wait inside unless u get there b4 me." Villapando: "K." Smith: "okay il head over there." Villapando: "I'm almost there." Smith: "im wearing a purple sheatshirt and my hair is up." Villapando: "K." Smith: "I hope ur car is warm!" Villapando: "It is." Smith: "kk" and "ill wait insiiide...to cold out here .. R u heree yet." Villapando: "too many red lights, I should be there in a couple of mins... Sorry." Smith: "good cuz this place is makin me hungry lol." Villapando: "Haha."

At 5:06 p.m., Villapando arrived at the parking lot of the Carl's Jr. restaurant located at the intersection of Yorktown Avenue and Beach Boulevard in Huntington Beach.[4] Smith sent Villapando a text message stating, "where r u."

---

[4] Smith testified this location was selected because, inter alia, it is several miles from the freeway and thus "avoids anyone saying that they accidentally arrived at the location."

9

Villapando responded, "R u by itself" and Smith stated, "yes." Villapando then drove out of the parking lot and was stopped by police officers in the area. Villapando told the police officers that he thought he was being arrested "because I came here to meet a 13-year-old girl." On the driver's seat of Villapando's car was a cell phone showing Smith's last text message to him. Villapando was wearing the black key chain lanyard with the Lakers logo he had described in an earlier e-mail to Caouette. He also had $110 cash in his wallet.

## II.

### SUMMARY OF DEFENDANT'S EVIDENCE

Villapando testified that on July 9, 2009, he went to the casual encounters section of the Craigslist Web site and answered a classified advertisement, hoping to meet someone. He stated he thought there was "no way" a 13 year old would be on Craigslist because it is an adult Web site. He testified that on July 9, he conducted a search using Jess's e-mail address and found a profile on the social Web site, MySpace. He stated that although Jess said she was 13 years old in the e-mail messages, the profile stated she was a 17 year old from Huntington Beach and displayed a picture of her. He admitted exchanging communications with Jess and discussing sexual activity in those communications. (Caouette testified in rebuttal that Jess's MySpace page had been changed to reflect that Jess was 17 years old, not 13 years old, but that change did not occur until November 12, 2009.)

Villapando testified that he traveled to Huntington Beach on December 22 because he "[j]ust wanted to find out who the person was [he] was talking to because [he] had no idea who [he] was talking to." He stated the cash he had with him that day was "poker money." Villapando also testified that he was not going to have sex with the person he met, but was going to give her $100. He stated he did not think he was meeting a 13-year-old girl that day.

10

Dr. Laura Brodie, a clinical and forensic psychologist, conducted an assessment of Villapando. She testified, "[t]he test indicated he did not, at that time, have a deviant sexual interest in children. He had what we call a normal heterosexual profile, which is adolescent and adult females."

## PROCEDURAL HISTORY

Villapando was charged in an information with attempting to commit a lewd and lascivious act upon a child under the age of 14 years, in violation of sections 664, subdivision (a) and 288, subdivision (a) (count 1); meeting a minor with the intent to engage in lewd conduct, in violation of section 288.4, subdivision (b) (count 2); and attempted contact with a minor with the intent to commit a lewd act upon the minor, in violation of section 288.3, subdivision (a) (count 3).

The jury found Villapando guilty of counts 1 and 3, but not guilty of count 2. The trial court imposed a total prison sentence of four years, but suspended execution of the prison sentence and placed Villapando on formal probation for five years with terms and conditions, which included serving 365 days in Orange County jail. Villapando appealed.

## DISCUSSION

### I.

#### STANDARD OF REVIEW

The trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Martinez* (2010) 47 Cal.4th 911, 953; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) This obligation includes the duty to give instructions on any affirmative defenses for which the record contains substantial evidence. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) A trial court must instruct the jury on the defense of

11

entrapment "if, but only if, substantial evidence supported the defense." (*People v. Watson* (2000) 22 Cal.4th 220, 222-223.) The Attorney General properly agrees that a trial court has a sua sponte duty to instruct on the defense of entrapment if substantial evidence supports the defense, citing *People v. Watson*, *supra*, 22 Cal.4th 220. Accordingly, we review the record to determine whether substantial evidence supported the entrapment defense to have triggered the trial court's obligation to instruct the jury regarding that defense. (*People v. Salas*, *supra*, at p. 982; *People v. Federico* (2011) 191 Cal.App.4th 1418, 1422.)

## II.

### THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY ON THE DEFENSE OF ENTRAPMENT SUA SPONTE.

"In California, the test for entrapment focuses on the police conduct and is objective. Entrapment is established if the law enforcement conduct is likely to induce a *normally law-abiding person* to commit the offense. [Citation.] '[S]uch a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the subject by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime.'" (*People v. Watson*, *supra*, 22 Cal.4th at p. 223; see *People v. Benford* (1959) 53 Cal.2d 1, 10 [the application of the entrapment defense depends upon whether "the intent to commit the crime originated in the mind of defendant or in the mind of the entrapping officer"].)[5]

---

[5] The standard jury instruction on the defense of entrapment, CALCRIM No. 3408, states: "Entrapment is a defense. The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard from proof beyond a reasonable doubt. To meet this burden, the defendant must prove that it is more likely than not that (he/she) was entrapped. [¶] A person is entrapped if a law

In *People v. Watson*, *supra*, 22 Cal.4th at page 223, the California Supreme Court identified the following two "guiding principles" in determining the applicability of the entrapment defense:  (1) "'if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established'"; and (2) "'affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment.  Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement.'"

Here, substantial evidence of entrapment was admitted at trial, showing police conduct that made the commission of the charged offenses unusually attractive to a

enforcement officer [or (his/her) agent] engaged in conduct that would cause a normally law-abiding person to commit the crime.  [¶] Some examples of entrapment might include conduct like badgering, persuasion by flattery or coaxing, repeated and insistent requests, or an appeal to friendship or sympathy.  [¶] Another example of entrapment would be conduct that would make commission of the crime unusually attractive to a normally law-abiding person.  Such conduct might include a guarantee that the act is not illegal or that the offense would go undetected, an offer of extraordinary benefit, or similar conduct.  [¶] If an officer [or (his/her) agent] simply gave the defendant an opportunity to commit the crime or merely tried to gain the defendant's confidence through reasonable and restrained steps, that conduct is not entrapment.  [¶] In evaluating this defense, you should focus primarily on the conduct of the officer.  However, in deciding whether the officer's conduct was likely to cause a normally law-abiding person to commit this crime, also consider other relevant circumstances, including events that happened before the crime, the defendant's responses to the officer's urging, the seriousness of the crime, and how difficult it would have been for law enforcement officers to discover that the crime had been committed.  [¶] When deciding whether the defendant was entrapped, consider what a normally law-abiding person would have done in this situation.  Do not consider the defendant's particular intentions or character, or whether the defendant had a predisposition to commit the crime.  [¶] [As used here, an *agent* is a person who does something at the request, suggestion, or direction of an officer.  It is not necessary that the agent know the officer's true identity, or that the agent realize that he or she is actually acting as an agent.]  [¶] If the defendant has proved that it is more likely than not that (he/she) ____ *<insert charged crime . . . >* because (he/she) was entrapped, you must find (him/her) not guilty of ___ *<insert charged crime>*."

13

normally law-abiding person. Villapando answered the advertisement in the casual encounters section of an adult forum that is limited to users age 18 and over. The advertisement inquired, "looking to get by in hard time" and offered "w4m," understood in such circles as offering a woman for a man. The advertisement also stated, "looking to have a good time are u :)." Nothing in the advertisement revealed that the poster was underage, much less 13 years old. Instead, the advertisement contained mature content, and the use of terms, such as "w4m," suggested the poster was at least somewhat experienced in the world of "casual encounters" on Craigslist. There is no evidence Villapando intended to reach out to a minor when he responded to the advertisement.

After Villapando answered the advertisement, Caouette informed him that he was communicating with a 13-year-old girl named Jess. Caouette later sent Villapando a picture of Jess, which Caouette had found on the Internet by using the Google search engine. The photograph showed an attractive, sexually developed young woman, wearing a skimpy bikini and standing in a provocative pose.

Villapando found Jess's MySpace profile by conducting an Internet search using Jess's e-mail address. The profile contained a photograph of a similar-looking young woman, who was also attractive and appeared to be more sexually developed than the young woman in the photograph Caouette had sent to Villapando; the young woman in the profile photograph was also scantily clad and in a somewhat provocative pose.

Villapando testified that on July 9, 2009, he found Jess's MySpace profile which stated she was 17 years old. Caouette testified that Jess's MySpace profile identified Jess as a 13 year old, until November 2009 when Caouette changed Jess's profile age to 17 years old. In any event, the trial evidence showed that Jess's MySpace profile stated Jess was 17 years old, not 13 years old, before Villapando drove to the Carl's Jr. restaurant on December 22, 2009, and was arrested.

Our review of the e-mail exchanges between Villapando and Caouette show that Jess had a flirtatious personality in those communications, occasionally ending

14

e-mail messages with happy faces and "xoxox." During their first exchange of communications, Jess informed Villapando that she would do what he wanted and would "do most anything" to earn $100. About a month later, Caouette reiterated in an e-mail to Villapando that Jess would "do almost anything" sexually. During the first day that Caouette and Villapando exchanged e-mail messages, after Villapando suggested that he pick up Jess and take her to a hotel room, Jess suggested that instead of showering before he picked her up, she could shower in the hotel room if he wanted her to. In another e-mail, Caouette stated that meeting up with Villapando sounded "fun." On several occasions, after Caouette had not heard from Villapando for a few days, Caouette would reinstate contact with him by sending another e-mail from Jess.

The text messages exchanged between Villapando and Smith similarly contained some banter of a sexual nature, including a text message in which Jess joked that Villapando was "not gonna stick it in [her] butt or anything right lol." Also, Smith, as Jess, told Villapando that Jess once before had "sex for money" but with a guy she knew.

The circumstances, described *ante*, constitute substantial evidence that would support a finding the police conduct went beyond simply creating the opportunity for Villapando to act unlawfully. The record supports the finding that the intent to commit the charged offenses, by seeking out a 13-year-old girl, originated in the mind of the police officers involved in this investigation, not in Villapando's mind. In the course of seeking consensual sex with a woman in an adult forum, Villapando was arguably induced by the police to pursue the fictional 13-year-old Jess, as they appealed to Villapando's sexual fantasies and urged him to continue the exchange of communications and meet for sex. The police officers involved in this investigation, therefore, arguably engaged in entrapment.

As we have noted in other cases, we do not mean to endorse the practice of pursuing casual sex on a Craigslist forum (although it is not against the law to engage in

15

this behavior, at least in theory).  But the test for a finding of entrapment is whether the average law-abiding citizen would be unduly tempted by the police conduct at issue, and, for the reasons discussed, we conclude substantial evidence would support such a finding. We do not express any opinion on whether entrapment actually occurred in this case.  On remand, it is for the trier of fact to determine whether the police went too far in this case. (See *People v. Barraza* (1979) 23 Cal.3d 675, 691, fn. 6 ["the defense of entrapment remains a jury question"].)

The trial court's failure to instruct the jury on the entrapment defense was not harmless, as a more favorable result for Villapando was reasonably probable had an entrapment instruction been provided.  (See *People v. Sojka* (2011) 196 Cal.App.4th 733, 738 [reasonable probability standard applies to failure to instruct on defenses].)  As discussed *ante*, on this record, a reasonable jury could have found that the police conduct here was likely to induce a normally law-abiding person to commit some or all of the charged crimes.


DISPOSITION

The judgment is reversed and the matter is remanded for a new trial.



FYBEL, ACTING P. J.

WE CONCUR:



IKOLA, J.



THOMPSON, J.


16